Steven R. LOWRIMORE, Appellant (Defendant Below),

v.

STATE of Indiana, Appellee (Plaintiff Below).

No. 49S00–9806–CR–315.

Supreme Court of Indiana.

May 26, 2000.

---

862

Ann M. Skinner, Indianapolis, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

BOEHM, Justice.

Steven Lowrimore was convicted of murder, felony murder, robbery as a Class A felony and criminal confinement as a Class B felony. He was sentenced to life imprisonment without parole for the murder and felony murder counts, fifty years for robbery, and twenty years for criminal confinement. In this direct appeal he contends that (1) his right to a speedy trial under Criminal Rule 4 was violated; (2) the State engaged in prosecutorial misconduct and violated *Brady v. Maryland* when it failed to timely disclose that a witness had filed a petition for postconviction relief; (3) the trial court erred in admitting marijuana and pipes into evidence; and (4) double jeopardy precludes his convictions and sentences for both murder and felony murder. We vacate the felony murder and criminal confinement convictions, reduce the robbery conviction to a Class C felony, and otherwise affirm the judgment of the trial court.

**Factual and Procedural Background**

Lowrimore shared a house in Indianapolis with Rebecca Lowe and Robert Malcom. In late August of 1995, Debra Lawyer, who worked as a dancer at a topless bar, also moved into the home. Within days of moving in, Lawyer was dead.

According to Lowe, she, Malcom, and Lowrimore were conversing on the evening of August 31. Lowrimore reported that he wanted money from Lawyer. Lowe suggested that Lowrimore simply ask for the money, but the three also discussed the possibility of grabbing Lawyer from behind and taking the money by force. Because robbing Lawyer would likely lead her to report the crime to police, Lowrimore stated, "No matter how we look at it, she has to die." At approximately 6:30 a.m. the next morning, Lowe and Lowrimore spoke in the living room while Malcom slept in the bedroom and Lawyer slept beside the bed. Lowe suggested that she sit on Lawyer and hold a pillow over her face. Lowrimore and Lowe waited until Lawyer was lying on her back. Lowe then "went down on [Lawyer's] chest and held the pillow over her face," while Lowrimore sat on Lawyer's legs and held one of her arms. Lawyer's scream wakened Malcom, and Lowrimore told Malcom to instruct Lowe not to let up. Malcom testified to essentially the same facts. He said that he awoke to find Lowe sitting on top of Lawyer holding a pillow over Lawyer's face while Lowrimore held Lawyer's feet.

After several minutes Lawyer was silent but Lowrimore told Lowe that he thought she had just passed out. Lowrimore then wrapped a cord around Lawyer's neck "and brought her straight up, [making] ... several snapping noises." Lowrimore retrieved cash from Lawyer's underwear. Later that day, Lowrimore, Lowe, and Malcom drove to McCormick's Creek State Park where they left Lawyer's body in a secluded area. Two weeks later, Lowe told police of the murder and took them to the body. Due to decomposition, the pathologist could not determine the specific cause of death.

Lowrimore, Lowe, and Malcom were charged with murder, felony murder, conspiracy to commit murder, robbery, conspiracy to commit robbery, and criminal confinement. Two months later, the State entered into a plea agreement with Malcom and filed an information seeking the death penalty against Lowrimore, alleging that Lowrimore had intentionally killed during the commission of a robbery. The State later entered into a plea agreement with Lowe.

In addition to Lowe and Malcom, Lawrence Bordenkecher testified at trial that in the first half of September of 1995, Lowrimore had visited his apartment where he stated, "I killed someone. And not only that, it was a woman and not only that, it was a titty dancer." James Burke, who was housed in the same cellblock of the Marion County Jail as Lowrimore in June of 1996, testified that Lowrimore showed him a picture of Lawyer and said that he had "killed this stupid bitch." He recounted that he had held Lawyer's legs while a "fat girl" got on top of her. Finally, another inmate, James Chelf, testified that in July of 1997, Lowrimore had told him that he had killed a girl named "Cricket"—Lawyer's nickname—and had broken her neck. In February of 1998 a jury found Lowrimore guilty of murder, felony murder, robbery, and criminal confinement. He was found not guilty of the remaining charges. The jury recommended a sentence of life imprisonment without parole, and the trial court followed that recommendation.

## I. Criminal Rule 4

Lowrimore first contends the trial court violated his Criminal Rule 4 right to a speedy trial. Rule 4(B)(1) provides that an incarcerated defendant who moves for a speedy trial is to be discharged if not brought to trial within seventy calendar days of the motion. It excepts from the seventy-day period any time attributable to a continuance or delay by the defense, court congestion, or an emergency. At his initial hearing on September 22, 1995, Lowrimore orally requested a speedy trial and the trial court set the case for trial by jury on November 27, sixty-six days after the speedy trial request.

On November 20, the State filed an information seeking the death penalty. Criminal Rule 24 requires appointed counsel in death penalty cases to consist of two attorneys meeting the qualifications of that Rule. The public defender who had been appointed to represent Lowrimore on September 27 was not qualified under Criminal Rule 24. The trial court vacated the November 27 trial setting, finding that "an emergency exists." Lowrimore objected to the continuance and later moved for discharge.

 Lowrimore first asserts that he is entitled to choose his speedy trial right "over the rule requiring two Criminal Rule 24 attorneys." Of course Lowrimore has the right to represent himself and to retain counsel. But if he chooses to proceed with court-appointed counsel the language of Criminal Rule 24 is mandatory and requires trial courts in death penalty cases to appoint two attorneys meeting the specified educational and experience levels. The only exceptions are a defendant's retention of private counsel, Crim. R. 24(B), or a competent defendant's knowing, intelligent, and voluntary waiver of his right to counsel in a timely and unequivocal manner, see Sherwood v. State, 717 N.E.2d 131, 137 (Ind.1999). Neither of these exceptions applies here. Thus, the trial court was required to appoint two Criminal Rule 24 qualified attorneys. This requirement became, as of November 20, a part of the legal environment of the case in the same sense as the trial court's schedule. It is a factor to be considered in evaluating the pace at which the case can proceed. The requirement of Criminal Rule 24 counsel is, of course, principally for the defendant's benefit, but not solely. The State has a strong interest in the proper conduct of every trial and that concern is maximized in death penalty litigation. Thus, a defendant accepting appointed counsel has no right to opt out of Criminal Rule 24.

 Lowrimore contends that, even if Criminal Rule 24 applies, no court emergency existed because there was no evidence that the Criminal Rule 24 qualifications could not be met by the November 27 trial date. A trial court's finding of congestion is presumed to be valid and need not be contemporaneously explained or documented. Clark v. State, 659 N.E.2d 548, 552 (Ind.1995). If a trial court makes

findings in response to a Motion for Discharge, its findings are reviewed under a clearly erroneous standard. *Id.* Although the face of the rule refers to "congestion of the court," which is understood by most to refer to demands imposed by other cases on the court's docket, our decisional law has interpreted court congestion more broadly to include "the unavailability of essential personnel or physical facilities." *Loyd v. State,* 272 Ind. 404, 408, 398 N.E.2d 1260, 1265 (1980). In addition, Criminal Rule 4(B)(1) allows trial courts to order a continuance upon a finding of "an emergency." In this case the trial court made the following finding: "To comply with Crim. R. 24, the trial judge had a duty to appoint two capital-qualified counsel. . . . This obligation created the existence of an emergency making it necessary for the trial judge to order a continuance of the trial date." Whether characterized as an emergency or court congestion resulting from the unavailability of essential personnel, i.e., two Criminal Rule 24 qualified attorneys, the trial court's findings are reviewed under the clearly erroneous standard enunciated in *Clark.*

Lowrimore suggests that the appointment of Criminal Rule 24 qualified counsel could have been made and trial held within a week. The trial court's conclusion was to the contrary and is supported by the record. We do not believe that even the most capable attorneys could prepare a death penalty case involving forty witnesses and over 100 pieces of evidence in a week, even by use of depositions and other materials generated by predecessor counsel. Moreover, no counsel had yet prepared for the expected testimony of Malcom, which had just been secured pursuant to his plea agreement. And no mitigating evidence had been investigated because, before November 20, this was not a death penalty case.[1] It also seems impossible

that the reduced caseloads required for death penalty counsel by Criminal Rule 24(B)(3) could have been met on the requested timetable. Finally, the trial court's own schedule would obviously be affected by conversion of the case to a death penalty proceeding. As the State argues on appeal, a capital case takes considerably longer to try because of the need for extended voir dire before the presentation of evidence and the additional requirement of a penalty phase. Additional jurors would have been needed and a more detailed juror questionnaire would likely have been required. All of this could not have been done in a week. The trial court's revised timetable was within the constitutional requirements for a speedy trial. Under these circumstances the tighter Criminal Rule 4 schedules must yield to the exigencies created by the injection of the death penalty. The trial court's finding—whether styled emergency or congestion—appears correct, and is certainly not clearly erroneous.

■■■ Finally, Lowrimore argues that in the face of his speedy trial request the State should not have been permitted to wait two months to file the death penalty. According to a newspaper article included in the record, the State was considering seeking the death penalty in this case as early as September. According to the State, however, the decision was postponed until it reached a plea agreement with Malcom, "an eyewitness who can testify to how the defendant killed the victim and effectuated a robbery contributing to evidence of the necessary aggravating factor for the death penalty." The delay in filing the death penalty appears to be a considered decision and certainly was a reasonable response to the uncertain state of the evidence against Lowrimore before the plea agreement with Malcom was finalized.

---

1. The United States Supreme Court recently emphasized the importance of mitigating evidence in capital cases. *See Williams v. Taylor,* —— U.S. ——, ——–——, 120 S.Ct. 1495, 1515–16, 146 L.Ed.2d 389, 420–21 (2000) (re-

manding for a new penalty phase while observing that mitigating evidence may influence the jury's appraisal of the defendant's moral culpability and alter its selection of a penalty).

Lowrimore does not contest the timeliness of the filing of the death penalty count as a free-standing matter, and its filing three days after the omnibus date and a week before the scheduled trial was timely. *See Games v. State*, 535 N.E.2d 530, 534–36 (Ind.1989). Rather, Lowrimore implies that prosecutors must file the death penalty within days of a speedy trial request, or never, so that the requirements of both Criminal Rule 4 and Criminal Rule 24 can be satisfied. We do not believe this is a basis for discharging Lowrimore. If it were, the effect of such a doctrine would be to force premature decisions seeking the death penalty to avoid risking discharge. This in turn could cause delayed charging instruments to avoid starting the Criminal Rule 4 clock. None of these tactical considerations should become dominant in the serious business of death penalty litigation. The values of Criminal Rule 4 are important, but so long as constitutional speedy trial standards are met, these values must yield to the exigencies created by the death penalty charge if the two cannot be reconciled.

In sum, although it is conceivable that a death penalty case might be tried within the seventy-day period of Criminal Rule 4, it would almost certainly require the diligent work of two Criminal Rule 24 attorneys throughout the time period. Here, counsel would have been given a single week. The trial court's finding of an emergency under these circumstances was not clearly erroneous.

## II. Prosecutorial Misconduct

On the morning of January 30, 1998, Malcom testified against Lowrimore pursuant to a plea agreement. His testimony spanned several hours and encompassed some 250 pages of the record. Near the end of cross-examination, defense counsel discovered that Malcom had filed a petition for postconviction relief three and a half months earlier. The petition alleged, in part, that his guilty plea was not voluntary and "was induced by fraud, fear, force and ignorance." Although a copy of the petition had been mailed to Deputy Prosecutor Barb Trathen on October 8, 1997, she stated late in the day on January 30, 1998, that she had not discovered the sealed envelope containing the petition until the previous evening.[2] Nevertheless, she did not provide a copy of the petition to defense counsel the next morning, but rather allowed counsel's extended cross-examination of Malcom to proceed without the potential impeaching value of the postconviction petition. Upon its discovery, Lowrimore moved for a mistrial. The trial court accepted Trathen's explanation that she had not discovered the sealed envelope containing Malcom's petition until the evening of January 29, but found that the failure to disclose it to the defense the following morning was a violation of the court's discovery order. Although the trial court found the State's actions to be "highly improper," it found that the failure to timely disclose the petition did not place Lowrimore in a position of grave peril, and thus denied the motion for a mistrial. The trial court allowed the defense another opportunity to cross-examine Malcom on the content of his petition for postconviction relief.

### A. Brady Claim

Lowrimore contends that the State's actions violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, which require the State to disclose evidence that is favorable to the accused and material to the accused's guilt or punishment. *See Williams v. State*, 714 N.E.2d 644, 648–49 (Ind.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 1195, 145 L.Ed.2d 1099 (2000). Evidence favorable to the accused includes impeaching evidence. *Id.* at 649. In this

---

**2.** Trathen explained to the trial court that the sealed envelope containing the petition was "buried in the Robert Malcom file." When asked if she knew how it got there, Trathen responded, "Interns who have been working—There's been a turnover of folks working on the file. Apparently, it had just gotten stuffed in there by mistake."

case, however, we note that Malcom's post-conviction petition was disclosed during trial; Lowrimore was given an opportunity to question Malcom about it; and the jury was able to weigh its impeaching value in its verdict. *Brady*, which applies to the discovery of favorable evidence "after trial," *see United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), does not apply here. *See Williams*, 714 N.E.2d at 648–49; *accord Dye v. State*, 717 N.E.2d 5, 12 (Ind.1999).

**B. *State Law Claim of Prosecutorial Misconduct***

■■■ Lowrimore also contends that the belated disclosure constitutes prosecutorial misconduct. A claim of prosecutorial misconduct requires a determination that there was misconduct by the prosecutor and that it had a probable persuasive effect on the jury's decision. *Cox v. State*, 696 N.E.2d 853, 859 (Ind.1998). The trial court found the State's belated disclosure of the postconviction petition to be misconduct, but found that the misconduct did not have a probable persuasive effect on the jury's decision and denied the motion for mistrial. A mistrial is "an extreme remedy granted only when no other method can rectify the situation." *Heavrin v. State*, 675 N.E.2d 1075, 1083 (Ind.1996) (quoting *Underwood v. State*, 644 N.E.2d 108, 111 (Ind.1994)). Here, the trial court allowed Lowrimore another opportunity to question Malcom about the postconviction petition and Lowrimore points to no reason why this was not an adequate remedy.

In *Goodner v. State*, after the eyewitness to a murder concluded his testimony, the prosecutor revealed to defense counsel that he had previously offered to recommend a bond reduction for the witness on an unrelated charge. 714 N.E.2d 638, 640 (Ind.1999). The witness was recalled the next day and the arrangement was revealed to the jury. We found that the "[c]omplete failure to disclose this deal would constitute prosecutorial misconduct and require a new trial," but that "[u]nder

current doctrine reversal under these circumstances is not required." *Id.* at 642. Here, as in *Goodner*, disclosure occurred at trial and defense counsel was able to question the witness about the belatedly disclosed material. The trial court did not abuse its discretion in denying Lowrimore's motion for a mistrial.

■■■ We reiterate the importance of the State's timely disclosure of evidence to the defense. This Court noted in *Goodner* that a prophylactic rule requiring reversal may be required if recurring abuses occur. *See id.* In the months since *Goodner*, several other cases have presented issues of belated disclosure, *see Warren v. State*, 725 N.E.2d 828, 832 (Ind.2000); *Dye*, 717 N.E.2d at 11–12; *Gardner v. State*, 724 N.E.2d 624, 628 (Ind.Ct.App.2000). Disturbingly, each of these cases, like *Goodner* and *Williams*, arises in Marion County. Lowrimore's trial, like each of the others, occurred before our opinion in *Goodner*. Accordingly, we will not consider abandoning the requirement of a showing of prejudice from belated disclosure until the issue is presented in a trial occurring after *Goodner* was issued.

**III. Marijuana Evidence**

Lowrimore argues that the trial court erred in admitting a bag of marijuana and two pipes found in his house. Lowrimore objected to the evidence at trial on relevancy grounds, noting this was a murder case, not a drug case. The State responded that there had been previous testimony as to the usage of marijuana around the time of the crime, and the admission of the evidence merely corroborated testimony of other witnesses. The trial court overruled the objection and admitted the evidence.

■■■ " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401. Relevant evidence "may be ex-

cluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Ind. Evidence Rule 403. The only issue of any consequence in Lowrimore's trial was the identity of Lawyer's killer. Whether Lowrimore had smoked marijuana or had possession of marijuana near the time of the offense had no relevance. Accordingly, the marijuana and pipes should not have been admitted.

■ Nevertheless, as this Court explained in *Fleener v. State,* 656 N.E.2d 1140, 1142 (Ind.1995), "an error will be found harmless if its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties." *See* Ind. Trial Rule 61. Here, the State presented strong evidence of Lowrimore's guilt. Both Malcom and Lowe provided eyewitness accounts of the killing. In addition, Bordenkecher, Chelf, and Burke all testified about Lowrimore's post-crime confessions of guilt to them. The erroneous admission of this evidence was harmless.

## IV. Double Jeopardy

■ Lowrimore was convicted of murder, felony murder, robbery as a Class A felony and criminal confinement as a Class B felony. The State concedes that a defendant may not be convicted of both murder and felony murder for the killing of the same person. *See, e.g., Garrett v. State,* 714 N.E.2d 618, 621 (Ind.1999). Accordingly, the felony murder conviction must be vacated. The jury's verdicts also raise other issues under the Indiana Double Jeopardy Clause. As explained in *Richardson v. State,* 717 N.E.2d 32, 53 (Ind.1999), the actual evidence test prohibits dual convictions if there is "a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also

have been used to establish the essential elements of a second challenged offense."

■ A person who knowingly or intentionally confines another person without the other person's consent commits criminal confinement, a Class D felony. Ind. Code § 35-42-3-3 (1998). The offense becomes a Class B felony if it results in serious bodily injury to the other person. *Id.* Here, the jury was instructed that to convict Lowrimore of criminal confinement the State must have proven that he confined Lawyer without her consent by holding her on the ground and pushing a pillow against her face and choking her with a cord, which resulted in serious bodily injury to Lawyer, that is, a broken neck. To convict Lowrimore of murder, the jury was instructed that the State must have proven beyond a reasonable doubt that Lowrimore knowingly killed Lawyer by means of asphyxiation. Based on these instructions and the absence of any additional basis for a criminal confinement conviction in the State's closing argument, we believe there is a reasonable possibility—indeed a high probability—that the jury used the same evidentiary facts—the suffocation and choking of Lawyer—to prove both the murder charge and the criminal confinement charge. Accordingly, the criminal confinement conviction must be vacated.

■ Robbery as a Class C felony is defined by statute as knowingly or intentionally taking property from another person by using or threatening the use of force or putting any person in fear. Ind. Code § 35-42-5-1 (1998). It becomes a Class B felony if committed while armed with a deadly weapon or if it results in bodily injury to any person other than the defendant, and a Class A felony if it results in serious bodily injury to any person other than the defendant. *Id.* The jury was instructed that to convict Lowrimore of robbery the State must have proven beyond a reasonable doubt that Lowrimore took United States currency from Lawyer by putting her in fear or using or threatening the use of force on Lawyer, which

resulted in serious bodily injury, that is, a broken neck. Because of the decomposition of Lawyer's body, the cause of death was undetermined. The murder instruction merely mentions killing by "asphyxiation," which presumably could be either suffocation with the pillow or Lowrimore's tying the cord around Lawyer's neck. Because there is a reasonable possibility that the same evidence used by the jury to establish the essential elements of murder was also included among the evidence establishing the essential elements of robbery as a Class A felony, the two cannot stand. The robbery conviction was elevated based on the same serious bodily injury that formed the basis of the murder conviction. Accordingly, we remand to the trial court to reduce the robbery conviction to a Class C felony and to impose a sentence of eight years.[3] *Cf. Chapman v. State*, 719 N.E.2d 1232, 1234 (Ind.1999) (reducing a Class A felony conviction for robbery while armed with a handgun to a Class B felony based on *Richardson* ).

## Conclusion

Steven Lowrimore's conviction for murder and sentence of life imprisonment without parole is affirmed. This case is remanded to the trial court with instructions to vacate the convictions for felony murder and criminal confinement, and to reduce the robbery conviction to a Class C felony and impose a sentence of eight years on that count.

SHEPARD, C.J., and DICKSON, SULLIVAN and RUCKER, JJ., concur.

---

**3.** Lowrimore was sentenced to the maximum sentence of fifty years for robbery as a Class A felony, and does not challenge the enhancement of that sentence on appeal. There is no need to remand for a new sentencing where, as here, it is sufficiently clear that the trial court would impose the maximum sentence for the Class C felony. *See Cutter v. State*, 725 N.E.2d 401, 410 n. 4 (Ind.2000).