Phillip A. STROUD, Appellant (Defendant below),

v.

STATE of Indiana, Appellee (Plaintiff below).

No. 71S00–0011–DP–00642.

Supreme Court of Indiana.

May 25, 2004.

Eric K. Koselke, Brent Westerfeld, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, James B. Martin, Deputy Attorney General of Indiana, Indianapolis, IN, Attorneys for Appellee.

SULLIVAN, Justice.

Defendant Phillip A. Stroud was convicted by a jury of three murders, burglary, robbery, and attempted robbery. The jury recommended a sentence of death and the trial court imposed a death sentence for each of the three murders and twenty years for each of the other crimes. Defendant appeals his convictions and sentences. We affirm Defendant's convictions but vacate his sentences and remand the case to the trial court for new penalty and sentencing phases.

## Background

The bodies of Wayne Shumaker, Lynn Ganger, and Corby Myers were found on the afternoon of September 14, 2000, in a barn on the property of Arthur and Theresa Sears in Lakeville, Indiana. Shumaker, Ganger, and Myers had been building a loft in the Searses' barn. They were found lying face down on the barn floor, their hands tied behind their backs with duct tape, and all had died from gunshot wounds to the head. On September 18, 2000, the State charged Phillip A. Stroud, approximately age 21 at the time, with three counts of murder; three counts of felony murder; one count of burglary, a Class A felony; and three counts of robbery, all Class B felonies.

At trial, the State's main evidence against Defendant consisted of testimony from others involved in the incident, ballistics testimony, and shoeprint testimony. According to some witnesses, Phillip Stroud, Tyrome Wade, Kerel Seabrooks, and Ronald Carter went to the Searses' residence with the intent to steal from the place. They learned about the Searses' residence from Charity Payne, a former girlfriend of the Searses' son. Ronald Carter, who was also charged for the crimes and testified pursuant to a plea bargain with the State, said that Defendant shot the three men.

It appeared that four bullets had been fired, but it could not be determined conclusively whether all of the bullet fragments found at the scene were fired from the same gun. It is possible that the bullets were fired from an Intratec Tec-9 gun. Ronald Carter testified that Defendant carried a Tec-9 gun.

Shoeprint marks were found on pieces of lumber inside the barn, and they could have been made by a pair of Nike shoes taken from the apartment of Defendant's girlfriend when he was arrested. These same Nike shoes had some debris on them, which was compared to debris at the crime

scene. A carpet fiber found on the shoes had the same class characteristics as carpet from the Searses' home. The Nike shoes also had animal feces on them, and an expert testified that the feces on the Nike shoes and the feces from the ground at the crime scene were likely from the same animal.

The defense did not put on any witnesses during the guilt phase of trial.

The jury found Defendant guilty of three counts murder and three counts felony murder, which the trial court merged; one count burglary, a Class B felony; two counts robbery, Class B felonies; and one count attempted robbery, a Class B felony. After the penalty phase of the trial in which the defense presented evidence of mitigating circumstances, the jury recommended that Defendant receive the death penalty. Judge Means, in his sentencing order, stated that he believed Indiana's amended death penalty statute required him to follow the jury's recommendation. If he were not so constrained, however, he said he would "be inclined to judicially override the jury recommendation for death." (Appellant's App. at 642.) He sentenced Defendant to death for each of the murders and to 20 years for each of the other four counts.

Pursuant to Indiana Appellate Rule 4(A)(1)(a), Defendant directly appealed his convictions and sentences to this Court. We affirm Defendant's convictions but vacate his sentences and remand the case to the trial court for new penalty and sentencing phases.

### Discussion

### I

■ Defendant argues that he was improperly denied the right to represent himself under the United States and Indiana Constitutions. *Faretta v. California*, 422 U.S. 806, 821, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), held that the right of self-representation is implicit in the Sixth Amendment to the United States Constitution, and Article 1, § 13, of the Indiana Constitution also guarantees this right. A request to proceed pro se is a waiver of the right to counsel, and consequently, there are several requirements to invoking the right of self-representation successfully. A defendant's "request must be clear and unequivocal, and it must be [made] within a reasonable time prior to the first day of trial." *Russell v. State*, 270 Ind. 55, 64, 383 N.E.2d 309, 315 (1978); *accord Sherwood v. State*, 717 N.E.2d 131, 135 (Ind.1999). In addition, a defendant's choice to proceed pro se must be "knowing, intelligent, and voluntary." *Jones v. State*, 783 N.E.2d 1132, 1138 (Ind.2003); *accord Sherwood*, 717 N.E.2d at 134–35.

■ On three separate occasions, Defendant requested to represent himself. Defendant made his first request on September 19, 2000, at the initial hearing before a magistrate. At the time Defendant was charged in this case, two other cases involving drug dealing were pending against him. Defendant stated that he "would like to go pro se on these matters with standby counsel." (Tr. at 6 (magistrate).) The magistrate told Defendant that his case was being assigned to Judge Means, suggested that Defendant could "revisit that issue" then, and stated that he would appoint a public defender. (*Id.*) Defendant responded, "Okay." (*Id.*) Here, Defendant's right of self-representation was not violated, because the magistrate did not deny that right to Defendant. Rather, he told Defendant to raise the issue in a more appropriate forum, in front of the judge who would preside over his case. Defendant expressed no objection to this procedure.

When Defendant appeared before Judge Means on October 2, 2000, he did not raise

the issue of representing himself. At that hearing, Defendant requested a delay in the drug dealing cases and a speedy trial in the murder case. A trial date of December 4, 2000, was set for the murder case and no ruling was made on Defendant's request for a delay in the other cases.

■ Defendant made his second request to represent himself at the next hearing in front of Judge Means, on October 26, 2000. At the time, the lawyers, the court, and Defendant were discussing the various cases pending against him. Defendant asked to have his other two cases delayed until the murder case was concluded. Judge Means said that at least as to one of those cases, which went back to July, 1999, he would deny a continuance and the case would proceed to trial. Defendant then responded, "I'm not ready. If it's like that, I'd like to enter my appearance as pro se on all of my matters." (Tr. at 11–12 (trial judge).) Judge Means denied Defendant's request, explaining that the trial date for this particular case was set for November 2, 2000. In this context, it is clear that the focus was on the case going to trial the following week and not on any of the other cases. Judge Means's response was to that case alone, and he properly denied that request for lack of timeliness. *See Sherwood,* 717 N.E.2d at 135; *Russell,* 270 Ind. at 63–64, 383 N.E.2d at 315. Given this context, to the extent that Defendant was asking to represent himself in the murder case, if at all, his request was not clear and unequivocal.

Moreover, the sincerity of Defendant's request seems questionable, for it appears that he only made the request to stall the upcoming trial. *See Burton v. Collins,* 937 F.2d 131, 133–34 (5th Cir.1991) (affirming trial court's denial of a request for self-representation based on the finding that defendant's request was unclear because it was "simply a spontaneous response offered at a point when Petitioner realized he was not going to get a new lawyer"), *cert. denied,* 502 U.S. 1006, 112 S.Ct. 642, 116 L.Ed.2d 660 (1991). Judge Means was in the best position to evaluate Defendant's sincerity and the clarity of his request. We find that his ruling in this situation was not unreasonable.

■ Defendant's final request[1] occurred on February 11, 2002, at a hearing where Defendant's counsel filed a Motion to Proceed as Pro Se Counsel on behalf of Defendant. The court denied the motion because of the "grave circumstances of this particular type of proceeding." (Tr. at 122.) This time, Defendant appears clearly to have invoked his right of self-representation, and the appropriate course would have been for the trial court to hold a hearing to determine if Defendant's choice was knowing, intelligent, and voluntary. *Jones,* 783 N.E.2d at 1138; *Sherwood,* 717 N.E.2d at 134–35. Nevertheless, the overall circumstances lead us to conclude that Defendant waived his right to represent himself because he vacillated between representing himself and being represented by counsel.[2]

---

1. Defendant also sent a letter to his attorneys on June 18, 2002, requesting that they withdraw their representation of him. His attorneys brought this to the court's attention, but the court denied the request because both Stroud's attorneys and the Prosecutor were ready to proceed to trial.

2. It is important to distinguish between waiving the right to represent oneself at trial and

waiving the issue on appeal. We only mean the former here. We agree that "[t]o avoid a waiver of a previously-invoked right to self-representation, a defendant is not required continually to renew a request once it is conclusively denied or to 'make fruitless motions or forego cooperation with defense counsel in order to preserve the issue on appeal.'" *Orazio v. Dugger,* 876 F.2d 1508, 1512 (11th Cir.

The first time Defendant appeared before Judge Means on the murder case, he did not request to represent himself. On November 16, 2000, when the State filed a Request for the Death Penalty and the court stated that new counsel would be named for Defendant under Criminal Rule 24, Defendant did not object nor did he ask to represent himself. On December 4, 2000, when James Korpal entered his appearance for Defendant, Defendant did not object. After that, over a year passed and the court held eight pretrial hearings before Defendant again requested to represent himself. During this time, he allowed the appointed attorneys to represent him. *See Sherwood*, 717 N.E.2d at 136 (emphasizing in finding a denial of defendant's right to represent himself that defendant "explicitly objected to the court's order that appointed counsel appear on his behalf and represent him at trial" and that "[t]hroughout the entire trial, [defendant] at no time acquiesced in the presentation of a defense by appointed counsel").

 Several jurisdictions have held that even after its assertion, "the right to self-representation may be waived through conduct indicating that one is vacillating on the issue or has abandoned one's request altogether." *Williams v. Bartlett*, 44 F.3d 95, 100 (2d Cir.1994); *United States v. Heine*, 920 F.2d 552, 554–55 (8th Cir.1990); *United States v. Weisz*, 718 F.2d 413, 426 (D.C.Cir.1983), *cert. denied*, 465 U.S. 1027, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984); *Brown v. Wainwright*, 665 F.2d 607, 610–11 (5th Cir.1982); *United States v. Bennett*, 539 F.2d 45, 51 (10th Cir.1976), *cert. denied*, 429 U.S. 925, 97 S.Ct. 327, 50 L.Ed.2d 293 (1976); *Spencer v. Ault*, 941 F.Supp. 832, 840 (N.D.Iowa 1996). Similarly, some jurisdictions interpret the Supreme Court's jurisprudence as requiring

strict construction of the clear and unequivocal requirement. *See Burton*, 937 F.2d at 133; *Weisz*, 718 F.2d at 425–26. These are eminently sound policies. The right to counsel is a fundamental constitutional right and its abandonment should not be held lightly. *Johnson v. Zerbst*, 304 U.S. 458, 462–65, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). The *Faretta* court, which held that criminal defendants have a right to represent themselves, imposed the requirements of a clear, unequivocal request, and a knowing, voluntary waiver of the right to counsel, out of concern that defendants could "conduct [their] own defense ultimately to [their] own detriment." 422 U.S. at 834, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562; *see also Martinez v. Court of Appeal of California*, 528 U.S. 152, 161, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000) (holding there is no constitutional right to represent oneself on appeal and noting that "[o]ur experience has taught us that a pro se defense is usually a bad defense" (quotations and citation omitted)).

Moreover, courts must be wary of defendants asserting the right to represent themselves solely to delay proceedings or to create an issue for appeal. In explaining the requirement that defendants make a clear and unequivocal request, this Court has said:

> If the rule were otherwise, trial courts would be in a position to be manipulated by defendants "clever enough to record an equivocal request to proceed without counsel in the expectation of a guaranteed error no matter which way the trial court rules."

*Anderson v. State*, 267 Ind. 289, 294, 370 N.E.2d 318, 321 (1977) (quoting *Meeks v. Craven*, 482 F.2d 465, 468 (9th Cir.1973)), *cert. denied*, 434 U.S. 1079, 98 S.Ct. 1273,

1989) (quoting *Dorman v. Wainwright*, 798 F.2d 1358, 1367 (11th Cir.1986), *cert. denied*,

480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 801 (1987)).

55 L.Ed.2d 786 (1978). There is some evidence that Defendant requested to proceed pro se only to create an issue for appeal, though this is largely speculation. After Judge Means denied his second request, Defendant stated, "Let's get this on the record. You are denying my right to go pro se?" (Tr. at 14.) During his third request, he stated, "I just want it to be on the record. If you deny it, I understand, but I just want it to be on the record that I'm invoking my constitutional right in Court." (*Id.* at 122.)

That is not to say, however, that a court should be dismissive of a defendant's requests to proceed without a lawyer. It would be much easier to evaluate these claims on appeal if trial courts would err on the side of being cautious and hold a hearing to determine whether a defendant is waiving the right to counsel, even if such a hearing may not strictly be required because a defendant's request is not clear and unequivocal. *See Dowell v. State,* 557 N.E.2d 1063, 1066 (Ind.Ct.App.1990) (a defendant's "clear and unequivocal request within a reasonable time prior to trial" to proceed pro se triggers a duty of the trial court "to hold a hearing to determine the defendant's competency to represent himself and to establish a record of his waiver of his right to counsel"), *cert. denied,* 502 U.S. 861, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991).

Finally, the reasons Judge Means gave in his Supplemental Findings and Order dated February 20, 2002, to justify refusing Defendant's requests to represent himself are insufficient. The order stated:

That due to the defendant's behavior during prior appearances in Court including spitting upon a deputy prosecuting attorney, resisting authority resulting in him being forcibly removed from the Court room shouting obscenities and by defecating and/or urinating in his clothing while present in the Court said defendant presents a grave security risk to all persons present in the courtroom were he permitted to roam freely in the courtroom in presenting his own defense.

(Appellant's App. at 255.) The record reflects only that at a hearing on January 3, 2001, Defendant spit at the Prosecutor and the victims and was removed from the courtroom. In the four rulings on Defendant's requests to act pro se, the court never mentioned his behavior or potential security problems resulting therefrom. Defendant's conduct cannot be used as an after-the-fact justification for the trial court's denial of Defendant's request to represent himself. We also generally agree with Defendant that "[e]ven if these things did occur, the remedy would have been to shackle Stroud, not to deny him his constitutional right to self-representation." (Br. of Appellant at 18.) The insufficiency of this order, however, does not change the fact that Defendant waived his right to represent himself.

## II

Defendant argues that his right of cross-examination and right to present evidence, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Article I, § 13, of the Indiana Constitution, were violated when the trial court prohibited defense counsel from cross-examining a witness about DNA testing of shoe evidence.

The police searched the apartment of Defendant's girlfriend and found a pair of Nike shoes that appeared to have dog feces and a red soil substance on them. Similar substances were found at the crime scene. DNA testing was done on the shoes and an expert testified that there was a one in ten billion chance that the feces on the bottom of the shoes came

from an animal different from the one whose feces was at the crime scene. In addition, Ronald Carter testified that Defendant wore the shoes on the day of the shootings.

On cross-examination, defense counsel asked Sergeant Ronald Nowicki, the lead evidence technician for the South Bend Police Department's Special Crimes Unit and the person who categorized the evidence at the scene, "did you have the opportunity to send the inner soles of these cases to the Indiana State Crime Lab for DNA testing?" (Tr. at 802.) The State objected to the line of questioning and argued that it was "not designed to lead to relevant evidence" and that it had "a serious risk of misleading the jury." (*Id.* at 803.) The defense explained that the DNA testing showed that Stroud "was excluded," but the State said that there were three reports total and "subsequent reports from the DNA experts said that he could not be excluded as the wearer of those shoes." (*Id.* at 803–04.) The trial court sustained the objection but told counsel to "[l]ook at the reports .... if we have to go forward in that area, we will." (*Id.* at 804.)

■ To reverse a trial court's decision to exclude evidence, which we review for an abuse of discretion, there must be (1) error by the court, (2) that affects Defendant's substantial rights, and (3) the defense must have made an offer of proof or the evidence must have been clear from the context. Ind. Evidence Rule 103(a); *McCarthy v. State,* 749 N.E.2d 528, 536 (Ind.2001); *Hauk v. State,* 729 N.E.2d 994, 1002 (Ind.2000). In this instance, the trial court did err, but that error was harmless.

■ The trial court erred in excluding the DNA evidence because it was relevant. Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401. The defense sought to question Sergeant Nowicki about testing done on the inner soles of the Nike shoes in an effort to demonstrate that the testing showed Defendant was excluded. The shoes were a key piece of evidence linking Defendant to the crime scene. Under Indiana Evidence Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of ... misleading the jury...." Given the importance of the shoes, the possibility of misleading the jury would not substantially outweigh the probative value of a DNA test on the Nike shoes excluding Defendant.

■ Nevertheless, the trial court said that if counsel looked at the reports and felt it necessary to present evidence on that issue, the court would allow it. Defense counsel never again sought to question Sergeant Nowicki nor raise the issue of the testing of the Nike shoes. We can only speculate about counsel's action. Because the trial court did not foreclose the opportunity to present this evidence and because the defense never sought to introduce it, we cannot conclude that Defendant's substantial rights were prejudiced. The error was therefore harmless. And if any error was committed by trial counsel, that should be addressed in post-conviction relief where the issue can be fully briefed and a proper record developed.

### III

Defendant contends that the trial court erred under Indiana Evidence Rules 701 and 702 in allowing Sergeant Nowicki to give his opinion that Reebok shoes run smaller than Nike shoes.

The defense questioned Sergeant Nowicki about the size of the Nike shoes and

the size of Reebok shoes that were also taken from Defendant. He testified that the Nike shoes were size eleven and the Reebok shoes were size eleven and a half. The prosecution on redirect examination asked Sergeant Nowicki, "As a consumer of shoes and a person who has bought and tried on shoes in the process of buying shoes, is it, yes or no, your experience that shoes manufactured by the Reebok Shoe Company run smaller than shoes manufactured by other athletic shoe companies?" (Tr. at 807.) Defense counsel objected, and the court overruled the objection. Sergeant Nowicki then answered yes to the question. On recross-examination, defense counsel asked him how many times he had purchased Reebok shoes, Nike shoes, and Adidas shoes. He responded that he had bought each about twenty times.

■ A non-expert, or lay, witness may testify as to opinions or inferences if they are "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Ind. Evidence Rule 701. Testimony regarding shoe size is helpful in this case because, if the Nike shoes did not fit Defendant, there would be no scientific evidence linking him to the scene of the crime. And, since Sergeant Nowicki had purchased both Nikes and Reeboks approximately twenty times, his opinion about their different sizings was rationally based on his own perceptions. *Vasquez v. State,* 741 N.E.2d 1214, 1217 (Ind.2001) (affirming admission of two officers' testimony that the substance at issue was toluene, based on the officers' "observations and experience"); *cf. Hill v. State,* 267 Ind. 480, 488, 371 N.E.2d 1303, 1307 (1978) ("This Court has held that any witness may testify as to the appearance of an object observed. The fact that the police

officer is not an expert in clothing goes to the weight and not the admissibility of his testimony." (citation omitted)).

■ The problem here is that the foundation for Sergeant Nowicki's testimony was not laid before he gave his opinion. The prosecution did not ask any questions of Sergeant Nowicki to ascertain whether he had ever purchased Nike or Reebok shoes and consequently whether his opinion on their sizings could be rationally based on his perception of those shoes. Only after defense counsel asked him how many times he had purchased Nikes and Reeboks could the court know that his opinion was rationally based on his perception. Because an adequate foundation was laid immediately after the disputed testimony, however, any error in the admission of Sergeant Nowicki's testimony was harmless. *Stephenson v. State,* 205 Ind. 141, 215–16, 179 N.E. 633, 667 (1932) (upholding as harmless error the admission of a dying declaration even though a proper foundation had not been laid in advance because a proper foundation was later established).

## IV

■ Defendant argues that his right of confrontation under Article I, § 13, of the Indiana Constitution and the Sixth and Fourteenth Amendments to the United States Constitution was violated when the trial court admitted into evidence a copy of the Affidavit in Support of Probable Cause that was filed with the charges against him. Specifically, Defendant claims that the admission violated his constitutional right because the affidavit contained hearsay statements from the prosecuting attorney and from witnesses for the State. The State responds that the affidavit did not contain hearsay because "it was not offered to prove the truth of the statements

contained therein." (Br. of Appellee at 21.)

On cross-examination of Lieutenant James E. Clark, defense counsel asked him what an Affidavit in Support of Probable Cause is, whether it "states what the person is accused of doing," whether it may include the names of others involved, and whether "the defendant normally gets a copy" of it. (Tr. at 856–57.) The defense concedes that this line of questioning "was an attempt to explain how jail house informant Diangelo Chick may have been able to testify to facts surrounding the crime." (Br. of Appellant at 30.) The State requested that the court take judicial notice of the affidavit and admit it into evidence, because during Lieutenant Clark's testimony, "the issue of what was public knowledge was raised." (Tr. at 863.) The defense objected, and the court overruled the objection, stating: "you opened the door to it. The impression was that people had access to this information and that is how the word could spread. [The State is] entitled to counter with what exactly was in the supporting affidavit." (*Id.* at 864.)

It is clear in this context that the affidavit was not offered to prove the truth of what was stated within it. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c). The defense suggested that the informant's testimony could have been based on public knowledge rather than on conversations with the Defendant. The prosecution then sought to introduce the affidavit so that a comparison could be made between the information testified to by Chick and the information contained in the affidavit, and a conclusion could be drawn as to the source of Chick's informa-

tion. The trial court therefore did not err in admitting the affidavit into evidence.

## V

Defendant claims that his right to a speedy trial was violated, because the trial took place more than 70 days from the date of his Motion for Early Trial.

Indiana Criminal Rule 4(B)(1) requires that a defendant "be discharged if not brought to trial within seventy (70) calendar days from the date of [an early trial] motion, except where a continuance within said period is had on his motion, or the delay is otherwise caused by his act, or where there was not sufficient time to try him during such seventy (70) calendar days because of the congestion of the court calendar." The rule also states that "a trial court may take note of congestion or an emergency without the necessity of a motion, and upon so finding may order a continuance."

On October 2, 2000, the Defendant requested a speedy trial in this case. The State later filed a Request for the Death Penalty. Because Defendant's counsel was not qualified under Criminal Rule 24 to handle a capital case, new counsel had to be appointed. Consequently, at a hearing on November 16, 2000, the court delayed the trial date previously set. In doing so, the court said it was relying on a recent Indiana Supreme Court case holding that when the death penalty is requested, the speedy trial rule "must yield to" Criminal Rule 24. (Tr. at 16.)

The Court appears to have relied on *Lowrimore v. State*, 728 N.E.2d 860 (Ind. 2000), in which we held that the defendant's speedy trial right was not violated. The facts of *Lowrimore* are similar to the facts of this case. In *Lowrimore*, the defendant filed a motion for an early trial and a trial date was set within 70 days from that motion. Later, however, the

State sought the death penalty. The defendant's counsel was not qualified to represent Lowrimore in a capital case and so the court, finding an emergency, vacated the original trial date in order to appoint qualified attorneys under Criminal Rule 24. *Id.* at 864. On appeal, Lowrimore argued that he was "entitled to choose his speedy trial right over the rule requiring two Criminal Rule 24 attorneys." *Id.* (quotations omitted). We stated "if [a defendant] chooses to proceed with court-appointed counsel the language of Criminal Rule 24 is mandatory and requires trial courts in death penalty cases to appoint two attorneys meeting the specified educational and experience levels." *Id.* We did acknowledge two exceptions to Criminal Rule 24—the defendant's retaining private counsel or waiving his right to counsel and choosing to act pro se—neither of which were applicable in *Lowrimore. Id.*

█ Defendant argues that his case falls within one of the exceptions stated in *Lowrimore* because Defendant sought to represent himself. Defendant, however, did not request to represent himself when the court changed his trial date and stated it would appoint two Criminal Rule 24 qualified attorneys. Neither he nor his attorney objected to the appointment of Criminal Rule 24 attorneys or to the resulting continuance. Since Defendant did not do any of these things when his trial date was postponed, he cannot use his previous requests for self-representation to object under Criminal Rule 4.

Alternatively, Defendant argues that *Lowrimore* "is inapplicable because there was no showing that Crim. R. 24 qualified attorneys were not available who could have prepared Stroud's trial adequately." (Br. of Appellant at 37.) Defendant claims that for the three weeks between the time the State filed its request for the death penalty and the original trial date, "the

trial court allowed Stroud to be unrepresented by counsel." (*Id.*) Defendant provides no additional information regarding this claim, and without more, we cannot fairly address it.

## VI

█ Defendant claims that the State's Request for the Death Sentence did not identify which aggravating circumstances corresponded to which counts of murder and that this violated his right to have notice of the charges against him under Article I, § 13, of the Indiana Constitution and his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution. We find this contention meritless. In the State's death penalty request, each of the aggravating circumstances alleged specifically identifies the victim to which it refers. It is therefore clear to which murder count each of the aggravating circumstances applies.

█ Defendant also claims that his due process rights were violated because the State's death penalty request contains "no allegation that the State is requesting a sentence of death on any specific count of murder." (Br. of Appellant at 69.) Accordingly, it is unclear whether the State is requesting one death sentence or multiple death sentences, and if the State is requesting only one death sentence, it is unclear for which murder count the State is seeking death. We think that if there was confusion as to the State's request, any clarification or objection to it should have been made before trial. No such actions were ever taken by Defendant's attorneys. Defendant's attorneys did make a Motion to Dismiss the Death Penalty, but they did not raise in that motion any defect in the State's Request for the Death Sentence. This argument has consequently been waived. *Kirts v. State,* 689 N.E.2d 756, 757 (Ind.Ct.App.1997) ("The

rule that has developed is that a motion to dismiss a flawed charging instrument must be raised prior to trial or the error is waived. The rationale for this rule is to give the prosecution an opportunity to amend the charging instrument before trial so that the expense and time-consuming efforts in a trial will thus not be lost." (quotation and citations omitted)).

■ Defendant also argues that the State's Request for the Death Sentence was flawed because it did not allege the intended felony in the burglary charge. Neither the charging information nor the request for the death penalty adequately specifies the intended felony in the burglary charge. *See Bays v. State,* 240 Ind. 37, 45–47, 159 N.E.2d 393, 396–98 (1959), *cert. denied,* 361 U.S. 972, 80 S.Ct. 605, 4 L.Ed.2d 551 (1960). But, again, any defects in these documents should have been addressed before trial. Because they were not, the issue is waived.

## VII

■ Defendant makes numerous arguments challenging the constitutionality of Indiana's amended death penalty statute. We first address his claim that applying the amended statute to him violates the prohibition against *ex post facto* laws.

In 2002, Indiana's death penalty statute was amended and one of the amendments altered the jury's sentencing determination from a recommendation to one that is binding on the court. Ind.Code § 35–50–2–9(e) (1998), *amended by* 2002 Ind. Acts 117, § 2. Under the old statute, the jury would make its sentencing recommendation and the judge would then make a final sentencing determination, thereby providing a defendant with two different considerations of his sentence. *See* Ind.Code § 35–50–2–9(e) (1998). Under the new statute, however, there is only one sentencing determination, which is made by the jury, and the judge must apply the jury's determination. *See* Ind.Code § 35–50–2–9(e) (Supp.2002).

Defendant argues that, due to this change, the 2002 amended death penalty statute cannot constitutionally be applied to him because it would operate as an *ex post facto* law. He makes this claim under both the United States Constitution, Article I, § 10, and the Indiana Constitution, Article I, § 24.

■ Article I, § 10, of the United States Constitution states, "No State shall ... pass any ... ex post facto Law...." Article I, § 24, of the Indiana Constitution similarly states, "No ex post facto law ... shall ever be passed." *Ex post facto* can refer to several types of laws, but the prohibition applies only to laws affecting rights in the criminal context. The purpose of the prohibition against *ex post facto* laws is twofold. First, it is to prevent the legislature from abusing its power by "enacting arbitrary or vindictive legislation." *Miller v. Florida,* 482 U.S. 423, 429, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987). Second, it is to give fair notice of any changes in the law. *Id.* at 429–30, 107 S.Ct. 2446.

■ For an *ex post facto* question to arise, "the law 'must be retrospective, that is, it must apply to events occurring before its enactment.' " *Id.* at 430, 107 S.Ct. 2446 (quoting *Weaver v. Graham,* 450 U.S. 24, 29, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981), *overruled on other grounds, Cal. Dep't of Corr. v. Morales,* 514 U.S. 499, 506 n. 3, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995)). The 2002 amended death penalty statute operates retrospectively in Defendant's case. The crimes Defendant was convicted of were committed on September 14, 2000. His trial began on July 1, 2002, he was found guilty on July 20, 2002, and he was sentenced to death on September 4,

2002. The amended death penalty statute and the particular provision Defendant contends is *ex post facto* became effective on March 20, 2002, and states that it applies to "a defendant sentenced after June 30, 2002." Ind.Code Ann. § 35–50–2–9(e) (West Supp.2002) (Historical and Statutory Notes).

Based on the purposes underlying the prohibition against *ex post facto* laws, the United States Supreme Court has stated what laws will generally be considered *ex post facto*:

> It is settled, by decisions of this Court . . . that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto*.

*Beazell v. Ohio*, 269 U.S. 167, 169–70, 46 S.Ct. 68, 70 L.Ed. 216 (1925); *Collins v. Youngblood*, 497 U.S. 37, 43, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990) (stating that the "*Beazell* formulation is faithful to our best knowledge of the original understanding of the *Ex Post Facto* Clause"). This prohibition is not limited to substantive statutes, as some cases have previously held. *See, e.g., Dobbert v. Florida*, 432 U.S. 282, 292–94, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). Rather, it encompasses any law the effect of which is to "make innocent acts criminal, alter the nature of the offense, or increase the punishment." *Collins,* 497 U.S. at 46, 110 S.Ct. 2715 (stating that "the best way to make sense out of this discussion in the cases is to say that by simply labeling a law 'procedural,' a legislature does not thereby immunize it from scrutiny under the *Ex Post Facto* Clause").

■ Our Court has provided a somewhat different definition of what laws are *ex post facto* but the concept is the same. A law is *ex post facto* if it "substantially disadvantage[s] [a] defendant because it increase[s] his punishment, change[s] the elements of or ultimate facts necessary to prove the offense, or deprive[s] [a] defendant of some defense or lesser punishment that was available at the time of the crime." *Crawford v. State*, 669 N.E.2d 141, 150 (Ind.1996).

Indiana's amended death penalty statute is not an *ex post facto* law as applied to Defendant. It does not explicitly fall into any of the categories considered as *ex post facto* laws. It does not make criminal an act that previously was not criminal; it does not increase the punishment for a crime; and it does not eliminate any available defenses or a lesser punishment. The statute shifts the role of determining a defendant's final sentence from the judge to the jury. The potential punishments remains the same as well as what must be found in order to impose any punishment.

■ Defendant argues that taking away the judge's ability to override the jury's sentencing recommendation deprives him of another chance at life. That chance at life, however, is wholly speculative. A jury has the option of sentencing a defendant to death, life without parole, or a term of years if certain findings are not made. After the jury has made its recommendation, what the judge does thereafter cannot be predicted with certainty. The judge could follow the jury's recommendation or override it either for or against death. The mere possibility that a judge might override a jury recommendation for death and impose a lesser sentence instead is not enough to find that the statute violates the prohibition against *ex post facto* laws. *See Cal. Dep't of Corr. v. Morales,* 514 U.S. 499, 509, 115 S.Ct. 1597, 131

L.Ed.2d 588 (1995) ("The amendment creates only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment . . . and such conjectural effects are insufficient under any threshold we might establish under the *Ex Post Facto* Clause.").

▓▓▓ Related to the question of whether the amended death penalty statute is an *ex post facto* law in this case is the question of whether the jury was properly instructed. Defendant argues that the Eighth Amendment to the United States Constitution was violated when the jury was given contradictory instructions on its role in the sentencing process throughout the case.[3] Defendant requests that his death sentence be set aside and the case remanded for a new jury sentencing.

Initially during jury selection, the trial court told prospective jurors that their determination as to whether Defendant would receive death or life without parole would be binding on the court: "[I]f the jury makes a recommendation, you must understand that the Court is bound to follow the jury's recommendation." (Tr. at 54–55.) "I repeat that should the jury recommendation be either for imposition of the death penalty or life without parole, the Judge has no discretion to change the jury's recommendation." (*Id.* at 55–56; *see also id.* at 145.)

In the last two days of jury selection, the trial court told prospective jurors the opposite. The trial court stated (1) that if the jury recommends the death penalty, it is "a recommendation only" and "the Court

could sentence the defendant to life without parole," and (2) that if the jury recommends life without parole, that is also "only a recommendation and the Court could sentence the defendant to a term of years." (*Id.* at 800.)

In the final instructions, the trial court said the following to the jury:

If you . . . recommend that a sentence of death be imposed, it is a recommendation only and the Judge will sentence the defendant to death or life imprisonment without parole. The law does not require that the Judge must follow your sentencing recommendation.

If you . . . recommend that a sentence of life imprisonment without parole be imposed, it is a recommendation only and the Judge will sentence the defendant to life imprisonment without parole or to a term of years. The law does not require that the Judge must follow your sentencing recommendation.

If you . . . recommend that a sentence of a term of years be imposed, the law requires that the Judge must follow your recommendation.

[Y]ou may make no recommendation as to the sentence to be imposed upon the defendant and the Judge will be required to sentence the defendant to life imprisonment without parole or to a term of years.

(*Id.* at 1254–55.)

The trial court did impose on the jury a sense of seriousness about its deliberations:

In your deliberations about the appropriate sentence to recommend in this

---

**3.** The State contends that Defendant did not preserve this issue for appeal because he did not object to the trial court's instructions on the jury's sentencing role. As the accompanying text describes, there were a number of discussions during the course of the trial as to the proper instructions to use in this regard. At several points, Defendant objected to the judge's proposed jury instructions. (*See, e.g.,* Tr. at 781–85, 954–56, 965–66.) We find the issue adequately preserved for appeal.

case, you should assume that if you recommend the death penalty for Phillip Stroud he will, in fact, be executed.

. . . .

In deciding on the sentence in this case, you must recommend a sentence that you, in examining your individual consciences, the evidence presented, and the instructions of this Court, believe that Phillip Stroud should serve, not your belief about how this Court or some other authority might act on this case at a later date.

(*Id.* at 1258–59.)

After the jury pronounced its sentence of death, however, the trial judge stated that he had reviewed the law and felt that he was bound to follow the jury's recommendation, in contrast to how he had instructed the jury previously.

In *Caldwell v. Mississippi*, 472 U.S. 320, 328–29, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the U.S. Supreme Court held:

[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere. This Court has repeatedly said that under the Eighth Amendment "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." *California v. Ramos,* 463 U.S. [992,] 998–999, 103 S.Ct. 3446, 77 L.Ed.2d 1171 [ (1983) ]. Accordingly, many of the limits that this Court has placed on the imposition of capital punishment are rooted in a concern that the sentencing process should facilitate the responsible and reliable exercise of sentencing discretion.

The Court has limited this general rule, in requiring that "To establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams,* 489 U.S. 401, 407, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989).

There is a clear *Caldwell* violation here. And, as required by *Dugger,* the jury was not properly instructed on the law. A proper instruction would have informed the jury that it would make its sentencing recommendation and the judge would "sentence the defendant accordingly." Ind.Code § 35–50–2–9(e) (Supp.2002). The difference between the instructions that the jury should have received and the instructions that it did receive goes to the precise concern articulated in *Caldwell.* The jury was told that the judge was not bound to follow its sentencing recommendation if it recommended either death or life imprisonment without parole. In essence, the jury was told that the ultimate responsibility for sentencing the defendant did not rest with it, when in fact it did. We therefore cannot be certain that the sentencing process was "responsible and reliable." *Caldwell,* 472 U.S. at 329, 105 S.Ct. 2633.

■ The State argues that the trial court's instructions, that the jury should assume Defendant would be executed if the jury so recommended and that the jury should not consider how the trial court or any other court would act following the jury's recommendation, cures the *Caldwell* violation. It does not. That particular language was not given to the jury in isolation; rather, it was part of a series of instructions the totality of which made clear that the jury's sentencing determination was a recommendation only. Moreover, the language, couched as it is as an assumption, is not an explicit statement that the jury's determination is binding. When the jury was instructed it "should

assume" death would be imposed if it so recommended, it might well have interpreted the instruction as a statement that its task was a serious one rather than a definitive statement of what would happen. Such vague statements cannot overcome the overall effect of the instructions telling the jury that its sentencing decision was only a recommendation.

For this reason, we set aside Defendant's death sentence and remand for new penalty and sentencing phases. Because we have found a *Caldwell* violation and are remanding for new sentencing, it is not yet necessary to address Defendant's other constitutional claims. *Berwanger v. State,* 262 Ind. 339, 345, 315 N.E.2d 704, 707 (1974) (remanding to the trial court for a new sentencing hearing and stating that because of this disposition, it is not necessary to address defendant's constitutional claim); *State v. Darlington,* 153 Ind. 1, 4, 53 N.E. 925, 926 (1899) ("It is a rule of decision, that courts will not pass upon a constitutional question, and decide a statute to be invalid, unless a decision on that very point becomes . . . . absolutely necessary to a disposition of the cause on its merits."); *see also Ashwander v. Tenn. Valley Auth.,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (stating that the "Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of"). Defendant also alleges other defects in the penalty phase of trial and we similarly conclude that it is unnecessary to address those claims as any concerns can be addressed by trial counsel at the new penalty phase.

### Conclusion

We affirm Defendant's convictions. We vacate Defendant's sentences and remand to the trial court for new penalty and sentencing phases.

SHEPARD, C.J., and DICKSON, J., concur. RUCKER, J., concurs in result with a separate opinion in which BOEHM, J., concurs.

RUCKER, J., concurring in result.

I fully concur with the majority opinion except for section VII with which I concur in result. One of the issues presented by this case is whether the trial court is bound by the jury's sentencing recommendation. According to the majority the trial court is so bound. *See* Op. at 287 ("In 2002, Indiana's death penalty statute was amended and one of the amendments altered the jury's sentencing determination from a recommendation to one that is binding on the court."). However, I am not so sure this is correct. The amended statute actually provides in pertinent part, "If the jury reaches a sentencing recommendation, the court shall sentence the defendant accordingly." Ind.Code § 35–50–2–9(e). The question of course is what does "accordingly" mean in this context? I agree with the view expressed by Justice Boehm:

[A] sentence imposed "accordingly" means a sentence that takes into account the jury's recommendation and implements it, subject to the constraints imposed by law. . . . [T]he instruction to sentence "accordingly" includes the need to set aside a recommendation if it is not supported by evidence and the power to decline to impose death if, after consideration of all aggravating and mitigating factors, including those in the sentencing report, the judge concludes that death is inappropriate.

*Helsley v. State,* No. 63S00–0303–CR–103, 809 N.E.2d 292, 307, 2004 WL 1153052 (Ind.2004) (Boehm, J., concurring in result) (footnote omitted). In this case, believing

it had no choice other than to accept the jury's death sentence recommendation, the trial court lamented, "quite frankly, the Court would be inclined to override the jury if it could." Tr. at 173. If indeed the trial court concludes that a sentence of death is not appropriate, then it seems to me that even under the amended statute, the trial court is obligated to impose a term of years or life imprisonment without parole.

For the reasons the majority explains, I agree this cause should be remanded for a new penalty and sentencing phase of trial. However, I am persuaded that should a new jury return a recommendation of death, the trial court is not necessarily bound thereby. Therefore I concur in result with this portion of the majority opinion. In all other respects I fully concur.

BOEHM, J., concurs.