**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Nov 21 2013, 8:58 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MITCHELL A. PETERS**
Merrillville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RYAN D. JOHANNINGSMEIER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ANDREW LEE WATTS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 64A01-1208-CR-344 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE PORTER SUPERIOR COURT
The Honorable Mary R. Harper, Judge
Cause No. 64D05-1106-FA-5266

**November 21, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

Andrew Lee Watts appeals his conviction for class A felony dealing in cocaine. Watts raises several issues on appeal, which we restate as: (1) whether the trial court abused its discretion when it admitted the cocaine evidence; (2) whether the trial court abused its discretion when it denied his guilty plea; (3) whether the trial court abused its discretion when it permitted the State to amend the charging information; and (4) whether the trial court abused its discretion when it denied his equivocal request, which was made on the morning of trial, to proceed pro se. Finding no abuse of discretion, we affirm.

**Facts and Procedural History**

The facts most favorable to the conviction indicate that, on June 7, 2011, Detective Robert Gosbin of the Porter County Drug Task Force met with confidential informant David Nava, who stated that he could purchase cocaine from an individual known as "Big Money." Appellant's App. at 449.[1] Nava participated in numerous phone calls with Big Money in order to set up a time and place for the drug deal, with three of the phone calls being recorded by law enforcement. Nava and Big Money negotiated a purchase price of $300 for the cocaine and agreed to meet at the Town and Country parking lot in Portage.

Detective Gosbin met with Nava and searched him. No contraband was found on

---

[1] We note that the transcript before us is separately paginated in numerous different volumes in violation of Indiana Appellate Rule 28(A)(2) which provides in part, "The pages of the Transcript shall be numbered consecutively regardless of the number of volumes the transcript requires." This error possibly explains why the appellant's appendix is essentially a consecutively numbered reproduction of the entire transcript in violation of Indiana Appellate Rule 50(F) which states, "Because the transcript is transmitted to the Court on Appeal pursuant to Rule 12(B), parties should not reproduce any portion of the Transcript in the Appendix." For ease of reference, we will cite to the pages of the appendix on which the relevant portion of the transcript appears.

Nava. Detective Gosbin wired Nava with an audio transmitter and a hidden camera. Detective Gosbin gave Nava $400 in cash to purchase cocaine after that money had been photographed and the serial numbers had been recorded. Detective Gosbin then accompanied Nava to the Town and Country parking lot. Four officers were already at that location to maintain surveillance of the drug transaction.

Meanwhile, Watts called Kimberly Burger and asked her where the Town and Country parking lot was. Watts, whom Burger knew as "Jewels," told Burger that he needed a ride to that parking lot so that he could "pick up some money." *Id*. at 553. Burger agreed to drive him in exchange for crack cocaine. When Burger arrived to pick up Watts, Watts gave Burger three separate packets of crack cocaine. Burger, who was wearing a bikini top and shorts, placed the cocaine in the left side of her bikini top. Burger drove Watts to the Town and Country parking lot in her blue station wagon. Upon arriving in the parking lot, Watts looked around and thought that he heard a police radio coming from a black Ford Explorer. Undercover Detective Sara Rohe was indeed maintaining surveillance of the area in a black Ford Explorer.

Nava sat on a bench near the parking lot waiting for a call from Big Money. Nava finally spoke to Big Money, but Big Money indicated that he would not be coming. Instead, Watts called Nava and told him that he was in a blue station wagon in the parking lot. Nava started walking toward the vehicle, but Watts felt uneasy and began to leave. However, Watts stopped and instructed Nava to continue approaching the vehicle. Nava walked to the passenger side of the vehicle where Watts was sitting. Nava could see that Watts held crack

3

cocaine in his hand. Watts gave Nava the cocaine, and Nava gave Watts cash. As Nava walked away, Watts instructed Burger to drive toward Nava. Watts accused Nava of shorting him $40. Nava reached in his pocket and gave Watts $40. Watts and Burger then drove out of the parking lot. As they were leaving, Watts waved at Detective Rohe, who was still conducting surveillance in the black Ford Explorer. Even though he knew that he was being watched, Watts engaged in the drug deal because the "lure of money" was too great for him to overcome and also because he mistakenly believed that he needed to be caught selling drugs to the same person two times before he could be arrested for a dealing offense. *Id*. at 622.

After Watts and Burger left the parking lot, Nava gave Detective Gosbin the cocaine that he had purchased from Watts. He also gave Detective Gosbin the remaining $100 in cash. Detective Gosbin placed the cocaine into an evidence bag and placed the evidence bag in his pocket. Detective Gosbin again searched Nava and did not find any contraband. Nava described the two occupants of the blue station wagon as a "white female driver and a black male passenger." *Id*. at 459.

Detective Rohe followed the blue station wagon until uniformed officers could perform a traffic stop of the vehicle. Portage Police Department Officers James Maynard and Michael Candiano performed a traffic stop of the blue station wagon. Burger pulled the vehicle to the side of the road, but Watts placed his left foot on top of Burger's foot attempting to hit the gas pedal. Watts yelled at Burger, "[L]et's go, let's go, let's go. You're going to get me busted." *Id*. at 565. Officer Maynard observed that the vehicle was lurching

4

and that the occupants were struggling, so he rushed to the vehicle and ordered the occupants to put their hands in the air. Burger complied, but Watts did not. Because Officer Maynard could see that Watts was not holding a weapon, he reached into the vehicle and turned off the ignition. Watts then pulled cash from his pocket and threw it out the vehicle window. Officers Maynard and Candiano removed Watts and Burger from the vehicle.

After Detective Rohe arrived to assist, she asked Burger if she had any contraband on her person. Burger admitted that she had cocaine in her bikini top, and Detective Rohe found three small bags of crack cocaine in Burger's top. Detective Rohe placed the cocaine she had found on Burger into an evidence package and locked it in her undercover vehicle. Officer Maynard found $745 in cash that Watts had thrown out the vehicle window. It was confirmed that $300 of that cash was the purchase money that Detective Gosbin had given Nava to purchase cocaine. The evidence bags from Detective Gosbin and Officer Rohe were taken to the Drug Task Force office to be weighed and photographed. The cocaine sold to Nava by Watts was found to weigh 2 grams. The bags were then marked, sealed, and locked in an evidence vault. The sealed bags were subsequently transferred to Great Lakes Labs for testing.

On June 9, 2011, the State charged Watts with class B felony dealing in cocaine. The court conducted an initial hearing on that charge on June 10, 2011. On June 13, 2011, public defender Ken Elwood entered his appearance on behalf of Watts, and the trial court set a jury trial date for August 15, 2011. On July 26, 2011, counsel filed a motion to continue the trial date, and the trial court subsequently reset Watts's jury trial for October 3, 2011. Sometime

thereafter, Elwood withdrew his appearance, and on September 6, 2011, Larry Rogers entered an appearance on behalf of Watts and filed a motion to continue the jury trial. The trial court reset the jury trial for February 6, 2012. During a status hearing, on September 20, 2011, Watts rejected a plea agreement offered by the State that provided for him to plead guilty to class B felony dealing in cocaine with a sentence of ten years. Upon rejection of the plea, Watts was informed that the State intended to file a habitual offender enhancement.

Testing by Great Lakes Labs revealed that the cocaine sold to Nava by Watts had a weight of 4.72 grams. On January 20, 2012, the State filed an amended information charging Watts with class A felony dealing in cocaine. During the initial hearing on the amended charge, Watts objected to the filing of the amended information. The trial court overruled Watts's objection but granted his motion to continue the jury trial. The court reset the jury trial for June 11, 2012. Thereafter, on March 20, 2012, the trial court granted attorney Rogers's motion to withdraw his appearance due to a "breakdown in communication" between Rogers and Watts. *Id*. at 129. The court ordered the public defender's office to continue to represent Watts.

The State filed a habitual offender enhancement on March 28, 2012. On April 3, 2012, Bryan Truitt entered his appearance on behalf of Watts. During the initial hearing on the habitual charge held on May 7, 2012, Watts informed the trial court that he no longer wanted Truitt representing him. However, at the conclusion of the hearing, Watts decided that he wanted to proceed with Truitt. Subsequently, on June 4, 2012, at Watts's request, Truitt filed a motion to withdraw his appearance. During a hearing on the motion to

withdraw, Watts informed the trial court that he wanted yet another attorney. Due to the fact that Watts was on his third appointed attorney, and due to the looming trial date, the trial court denied the motion to withdraw. On June 6, 2012, Truitt filed a motion for a psychological evaluation of Watts as well as a motion to suppress. Following a hearing, on June 8, 2012, the trial court denied both motions.

Jury selection began on June 11, 2012. Prior to the selection of a jury, Watts made vacillating statements regarding whether he wished to proceed pro se or to continue with Truitt acting as his counsel. Truitt informed the trial court regarding plea negotiations with the State. The State's last offer that morning had been to allow Watts to plead guilty to class B felony dealing in cocaine, the habitual offender enhancement would be dismissed, and the State would make no sentencing recommendations. Watts refused to accept that agreement and instead counteroffered an agreement to plead guilty to class B felony dealing with a six-year sentence, three years being executed. When asked whether he wished to accept the State's original plea offer, Watts responded, "Yes and no." *Id*. at 311. The trial court ordered a recess to allow the parties to negotiate. The State then offered Watts an agreement wherein he would plead guilty to class B felony dealing with a twenty-year sentence, ten years being executed. Watts rejected the offer.

Following the recess, the trial court again asked Watts whether he desired to proceed pro se or with Truitt and gave him a detailed explanation regarding the perils of self-representation. Watts stated that he wanted an attorney, just not Truitt. The trial court replied that Watts could either have Truitt or represent himself. Watts declared that he did

7

not want Truitt to represent him, but stated that he could not represent himself either. Watts and the trial court continued this back-and-forth discussion, each time with Watts refusing to affirmatively state that he wanted to represent himself. At one point, Truitt interjected that Watts had decided to sign the plea agreement. The trial court informed Watts that the plea agreement deadline had expired and expressed great concern that allowing him to accept the agreement now would surely lead to him challenging the validity of the agreement in the future.

The trial court again inquired whether Watts wanted to proceed pro se, and Watts refused to answer, saying only, "I would like to have the plea I just signed." *Id*. at 325. The trial court explained that Watts's "vacillation" on the issue appeared to be "a strategic and manipulative course of conduct." *Id.* at 326. Indeed, the court stated, "You're vacillating too much and you're qualifying too much for me to believe it's voluntary." *Id.* at 328. The trial court returned to the issue of representation, with Watts continuing to refuse to commit to a position by responding to the trial court's inquiry with, "I do not want [Truitt] as my attorney, and I cannot represent myself" and "I want a Public Defender other than Bryan Truitt." *Id*. at 329. Watts then stated, "I would rather die than have him as my attorney." *Id*. at 330.

The trial court then informed Truitt that he no longer needed to represent Watts and that he could leave his file with Watts. However, just as prospective jurors began to enter the room for jury selection, Watts kneeled on the floor in the middle of the courtroom and began pleading, "Guidos, come get me out of here. Take me out. I'm out. Get me out please" and "In Jesus name could I please leave?" *Id*. The trial court informed Watts that he was

8

waiving his right to be present and had Watts removed from the courtroom. The court then requested Truitt to continue to represent Watts and proceeded with voir dire. Watts requested to return to the courtroom after voir dire, and the trial court granted that request. He conceded that he wished for Truitt to stay and represent him at that point.

On the second morning of trial, Watts filed a motion to reconsider accepting his plea agreement. The State responded that there was no longer a plea agreement offer that remained open. The trial court denied the motion to reconsider and explained why it had rejected Watts's earlier declarations that he wanted to accept the plea agreement, stating that it was simply "a mechanism to avoid the trial going forward and that I'd be looking at recanting and request for a new trial thereafter." *Id*. at 439. After the State began examining witnesses, Watts informed the trial court that he wanted to proceed pro se. The court again advised Watts of the risks of self-representation. Watts indicated that he understood and that he knew that he would not receive another attorney. When directly asked whether it was his choice to represent himself, Watts replied, "Yes, ma'am." *Id*. at 506. The trial court granted his request to proceed pro se and instructed the jury that Watts had decided to waive his right to counsel and that it should not infer anything from the exercise of that right.

At the conclusion of trial, on June 14, 2012, the jury found Watts guilty of class A felony dealing in cocaine. The State subsequently dismissed the habitual offender charge. Following a sentencing hearing, the trial court imposed a thirty-eight-year sentence, with six years suspended to probation. This appeal followed.

## Discussion and Decision

### *I. Chain of Custody*

Watts first asserts that the State presented insufficient evidence to sustain his conviction for class A felony dealing in cocaine. Watts's only argument in this regard is that the State failed to establish a sufficient chain of custody for the cocaine evidence and, therefore the trial court abused its discretion in admitting the evidence. We disagree.[2]

As noted by the State, although Watts did object to the admission of the cocaine evidence at trial, he did not object on chain-of-custody grounds. Instead, he objected "based on previous filings and hearing on Friday," referring to a pretrial motion to suppress and hearing held thereon. *See id*. at 380-81. It is unclear from our review of the transcript of the suppression hearing as to the specific grounds for the motion to suppress, and Watts has failed to include a copy of the motion to suppress in his appendix. "A contemporaneous objection at the time evidence is introduced at trial is required to preserve an issue for appeal, whether or not the appellant has filed a pretrial motion to suppress." *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010). Further, a party is not permitted to object to the admission of evidence on one ground at trial and then seek reversal on appeal using a different ground. *Bush v. State*, 929 N.E.2d 897, 898 (Ind. Ct. App. 2010). Here, absent a specific contemporaneous objection to the admission of the cocaine evidence, we are unaware of the

---

[2] Although Watts characterizes this issue as one of sufficiency of the evidence to support his conviction, his argument centers solely around the State's alleged failure to establish a sufficient chain of custody for the cocaine to be properly admitted into evidence. Because his only sufficiency of the evidence argument is regarding the evidentiary foundation for the cocaine evidence and because we deem that challenge unsuccessful, we need not address the sufficiency of the other evidence supporting his conviction.

grounds for objection asserted at trial, and consequently we conclude that Watts has waived his chain-of-custody claim for appellate review.

Waiver notwithstanding, the sufficiency of an evidentiary foundation for the admission of evidence is a matter left to the sound discretion of the trial court, and we will reverse only upon a showing of an abuse of that discretion. *Payne v. State*, 658 N.E.2d 635, 644 (Ind. Ct. App. 1995), *trans. denied* (1996). An abuse of discretion occurs if a trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Rolland v. State*, 851 N.E.2d 1042, 1045 (Ind. Ct. App. 2006).

Regarding chain of custody specifically, our supreme court has held:

The requirement that a chain of custody be proven by a party submitting physical evidence at trial is an attempt to satisfy the goal of assuring the trial court that the evidence submitted has not been substituted or tampered with. While the State is not required to exclude every possibility of tampering, the chain of custody must give reasonable assurances that the property passed through the hands of parties in an undisturbed condition.

*Johnson v. State*, 580 N.E.2d 670, 671-72 (Ind. 1991) (citation and quotation marks omitted). Moreover, the State is not required to establish a perfect chain of custody, and any gaps go to the weight of the evidence and not to admissibility. *Culver v. State*, 727 N.E.2d 1062, 1067 (Ind. 2000). "There is a presumption of regularity in the handling of exhibits by public officers." *Filice v. State*, 886 N.E.2d 24, 34 (Ind. Ct. App. 2008), *trans. denied*. Therefore, to mount a successful challenge to the chain of custody, one must present evidence that does more than raise a mere possibility that the evidence may have been tampered with. *Culver*, 727 N.E.2d at 1067.

11

Watts's challenge to the admissibility of the cocaine evidence has nothing to do with any proof or lack thereof regarding the chain of custody of that evidence. Indeed, our review of the record reveals that Detectives Gosbin and Rohe, and Porter County Drug Task Coordinator Robert Taylor, each testified regarding a continuous and undisturbed chain of custody for the cocaine evidence. It is presumed, as there is no evidence to the contrary, that the cocaine passed through various hands and was sent to Great Lakes Labs for testing in an undisturbed condition. Watts maintains simply that the weight discrepancy between the weight originally obtained at the Drug Task Force Office and that obtained by Great Lakes Labs indicates that there must have been an "insecure chain of custody for the evidence." Appellant's Br. at 22. However, in addition to testifying to a continuous and undisturbed chain of custody, Detective Gosbin and Coordinator Taylor each explained the weight discrepancy by indicating that they do not "trust" the scales at the Drug Task Force office, that the scales are "not accurate," and the that the "official" weight and character of drug evidence always comes from Great Lakes Labs. Appellant's App. at 526, 704-05. As stated above, to mount a successful challenge to the chain of custody, one must present evidence that does more than raise a mere possibility that the evidence may have been tampered with. *Culver*, 727 N.E.2d at 1067. Watts has not met his burden in this regard and, without more, Watts has failed to demonstrate that the trial court abused its discretion when it admitted the cocaine evidence at trial.

Watts further insists that the weight discrepancy indicates that the testimony of the detectives regarding the chain of custody of the cocaine evidence was of such "incredible

dubiosity" that the evidence was therefore insufficient to support his conviction. Appellant's Br. at 15. Watts misunderstands the incredible dubiosity rule. Under that rule, this Court may impinge upon the jury's responsibility to judge the credibility of witnesses only when confronted with inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony. *Manuel v. State*, 971 N.E.2d 1262, 1271 (Ind. Ct. App. 2012). Application of the rule is very narrow and permitted only "where a sole witness presents inherently contradictory testimony that is equivocal or coerced and there is a lack of circumstantial evidence of guilt." *Turner v. State*, 953 N.E.2d 1039, 1059 (Ind. 2011).

Because Watts challenges the testimony from more than one witness, and that testimony was not inherently contradictory, coerced, equivocal, or uncorroborated, the incredible dubiosity rule does not apply. Watts's reliance on the rule here is misplaced. Watts's claim is essentially a request for us to reweigh the evidence and reassess the credibility of witnesses in his favor, which we cannot do. Watts's challenge to the sufficiency of the evidence to support his conviction on chain of custody and incredible dubiosity grounds fails.

## II. Denial of Plea Agreement

We next address Watts's contention that the trial court abused its discretion when it denied his guilty plea pursuant to a plea agreement offer that no longer remained open. A defendant does not have an absolute right to have a guilty plea accepted, and a trial court may reject a plea in the exercise of sound judicial discretion. *Beeks v. State*, 839 N.E.2d 1271, 1273 (Ind. Ct. App. 2005), *trans. denied* (2006). Indeed, a trial court has wide discretion in

determining whether to accept a defendant's guilty plea, and we review the rejection of a guilty plea for an abuse of discretion. *Newsome v. State*, 797 N.E.2d 293, 297 (Ind. Ct. App. 2003), *trans. denied* (2004).

On the morning of trial, when questioned by the trial court, Watts vacillated and expressed much hesitancy regarding whether he wanted to accept a plea agreement that had been offered by the State. Rather than accept that agreement, Watts both rejected the agreement as offered and counteroffered his own terms. After the trial court recessed to allow the parties to continue to negotiate, Watts still expressed hesitancy and responded "I don't know" when asked whether he wanted to accept the State's most recent offer to plead guilty to class B felony dealing in cocaine with a sentence of twenty years with ten years suspended. Appellant's App. at 313-14. During continued questioning, Watts maintained his indecisive stance, with the trial court finally concluding that Watts's "vacillation" showed a "strategic and manipulative course of conduct." *Id.* at 326. By the time Watts expressed what appeared to be perhaps a true desire to plead guilty, the State responded that the previous plea offer had expired and that no plea offer remained open.

It is evident from the record that the trial court here engaged in a thoughtful discussion with Watts and could not be satisfied that Watts was freely accepting the plea agreement as offered at the time that it was offered. When Watts subsequently tried to accept the agreement, the offer was no longer open. Under the circumstances, we conclude that the trial court did not abuse its discretion in denying Watts's guilty plea.

14

### III. *Amended Information*

Watts asserts that the trial court abused its discretion when it permitted the State to amend the charging information from class B felony dealing in cocaine to class A felony dealing in cocaine.[3]  Indiana Code Section 35-34-1-5 provides in relevant part that an indictment or information may be amended in matters of substance at any time before the commencement of trial "if the amendment does not prejudice the substantial rights of the defendant."  In order for an amendment to affect a defendant's substantial rights, "he must prove he was denied 'a reasonable opportunity to prepare for and defend against the charges.'"  *Suding v. State*, 945 N.E.2d 731, 735-36 (Ind. Ct. App. 2011) (quoting *Sides v. State*, 693 N.E.2d 1310, 1313 (Ind. 1998), *abrogated on other grounds by Fajardo v. State*, 859 N.E.2d 1201 (Ind. 2007)), *trans. denied.*  "The substantial rights of a defendant are not violated if the amendment does 'not affect any particular defense or change the positions of either of the parties.'"  *Id*.  We review the trial court's decision to allow the State to amend a charging information for an abuse of discretion.  *Ramon v. State*, 888 N.E.2d 244, 253 (Ind. Ct. App. 2008).

We agree with Watts that the State's amendment of his charge from a class B felony to a class A felony is clearly an amendment of substance.  However, although Watts asserts that

---

[3] Indiana Code Section 35-48-4-1(a) provides that a person who knowingly or intentionally delivers cocaine, pure or adulterated, commits class B felony dealing in cocaine.  The offense becomes a class A felony if the amount of the drug involved weighs three grams or more. Ind. Code § 35-48-4-1(b). The State originally charged Watts with knowingly or intentionally delivering cocaine in an amount less than three grams, a class B felony, and subsequently filed an amended information charging him with knowingly or intentionally delivering cocaine in an amount greater than three grams, a class A felony.

his substantial rights were violated by the amendment, we conclude that they were not. The State filed the amended charge on January 20, 2012, almost five months prior to Watts's June 11, 2012, trial date. The record indicates that the State notified Watts of its intention to file the amendment two weeks prior to filing, but agreed to delay filing during plea negotiations. Despite this ample notice, Watts argues that he and his counsel were somehow misled in their trial preparation, but he points to nothing to indicate how his preparation changed or how any particular defense was substantially affected. Watts's defense to both class A felony dealing and class B felony dealing was the same. He simply claimed that no drug deal occurred by attacking the credibility of the confidential informant and law enforcement. While we recognize that the amended charge did prompt Watts to challenge the weight discrepancy of the cocaine between the Drug Task Force Office and Great Lakes Labs, he maintained the defense that, regardless of the weight, it was not his cocaine and no drug deal occurred.

Under the circumstances presented, Watts has failed to demonstrate how the State's amendment of the charging information five months before trial impacted his trial preparation such that he was denied a reasonable opportunity to prepare for and defend against the amended charge. Thus, he has not shown that his substantial rights were affected.[4] The trial court did not abuse its discretion in permitting the State to amend the information.

---

[4] Watts relies on *Marts v. State*, 432 N.E.2d 18 (Ind. 1982), and *Jones v. State*, 863 N.E.2d 333 (Ind. Ct. App. 2007), for his proposition that any amendment which changes the felony classification of a charge per se affects a defendant's substantial rights. Neither of those cases stands for that erroneous proposition, and we agree with the State that Watts misreads and overextends the holdings of those cases.

16

## IV. Request for Self-Representation

Finally, Watts asserts that the trial court abused its discretion when it denied his equivocal request, on the morning of trial, to proceed pro se. The right to self-representation is implicit in the Sixth Amendment to the United States Constitution, and Article 1, Section 13 of the Indiana Constitution also guarantees this right. *Stroud v. State*, 809 N.E.2d 274, 279 (Ind. 2004). However, a defendant's request to proceed pro se must be clear and unequivocal, and must be made within a reasonable time prior to the first day of trial. *Id.* A request to proceed pro se on the morning of trial is per se untimely, and denial of a request to proceed pro se on the ground of untimeliness is permissible. *Moore v. State*, 557 N.E.2d 665, 669 (Ind. 1990). Moreover, "the right to self-representation may be waived through conduct indicating that one is vacillating on the issue or has abandoned one's request altogether." *Stroud*, 809 N.E.2d at 281.

We initially note that Watts's request to proceed pro se on the morning of trial was per se untimely and denial by the trial court on such grounds would have been permissible. Still, during an extensive colloquy between the trial court and Watts on the morning of trial regarding whether he wished to proceed pro se or with his counsel, Watts vacillated and refused to clearly and unequivocally assert his right to proceed pro se, culminating in him throwing himself on the floor stating that he could not "do it by [him]self." Appellant's App. at 330. The record reflects that when Watts was finally willing to make a clear request to proceed pro se, on the second day of trial, the trial court honored that request. We observe that the trial court was nothing but gracious and accommodating to Watts, and his implication

to the contrary is not well taken. The trial court did not abuse its discretion when it denied Watts's untimely and equivocal request to proceed pro se.

In sum, Watts has failed to mount a successful challenge to the chain of custody of the cocaine evidence, and consequently his challenge on those grounds to the sufficiency of the evidence to support his conviction fails. The trial court did not abuse its discretion when it denied Watts's guilty plea or when it permitted the State to amend the charging information. Further, the trial court did not abuse its discretion when it denied Watts's equivocal request to proceed pro se. Accordingly, we affirm his conviction.

Affirmed.

BARNES, J., and PYLE, J., concur.