## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 23 2018, 9:33 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Suzy St. John
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jesse R. Drum
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Patricia Claywell, | March 23, 2018 |
| *Appellant-Defendant,* | Court of Appeals Case No. 49A04-1703-CR-567 |
| v. | Appeal from the Marion Superior Court |
| State of Indiana, | The Honorable Amy Jones, Judge |
| *Appellee-Plaintiff.* | The Honorable David Hooper, Magistrate |
| | Trial Court Cause No. 49G08-1606-CM-24914 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Patricia Claywell (Claywell), appeals her conviction for operating a vehicle while intoxicated in a manner that endangers a person, a Class A misdemeanor, Ind. Code § 9-30-5-2(b).

We reverse and remand.

# ISSUE

Claywell raises one issue on appeal, which we restate as: Whether the trial court denied her right to self-representation in violation of the Sixth Amendment to the United States Constitution.

# FACTS AND PROCEDURAL HISTORY

At approximately 3:00 p.m. on June 27, 2016, Ronald Brown (Brown) was standing on the corner of Dr. Martin Luther King Jr. Street and 25th Street in Indianapolis, Marion County, Indiana, when he observed a black SUV turn from Dr. Martin Luther King Jr. Street onto 25th Street and come to a complete stop in the middle of the road. The vehicle idled in the middle of the street for some time, and then a woman, later identified as Claywell, emerged from the vehicle and walked over to the sidewalk. Brown observed that she seemed "disoriented"; he questioned her as to whether anything was wrong but was unable "to understand" her response. (Tr. Vol. II, pp. 42-43). Claywell returned to the vehicle, "drove off about another five hundred or eight hundred feet and came to a complete stop." (Tr. Vol. II, p. 45). As Claywell sat

motionless in her vehicle in the middle of the street, Brown called for police assistance.

[5] Within minutes of Brown's report to 9-1-1, Indianapolis Metropolitan Police Department Officer Brian Meeks (Officer Meeks) arrived to check on the welfare of Claywell. Officer Meeks parked behind Claywell's SUV, which was "several feet from the curb." (Tr. Vol. II, p. 52). Officer Meeks remained in his vehicle for "[m]aybe five or six minutes" and noted that Claywell's vehicle was still running and, given that the brake lights were illuminated, still in gear. (Tr. Vol. II, p. 53). Officer Keith Shelton (Officer Shelton) arrived a short time later to provide assistance.

[6] Officer Meeks approached the driver-side window, and when he knocked, Claywell was "[s]urprised" to see him standing there. (Tr. Vol. II, p. 53). Claywell attempted to exit her vehicle but had failed to first shift it into park. Officer Meeks "had to walk her through the process of putting the car in park while turning the key back on so that she could manually move it into park and then shut the car off." (Tr. Vol. II, pp. 55-56). "It was like speaking to a small child." (Tr. Vol. II, p. 56). Claywell rolled down her window, and when Officer Meeks inquired as to her well-being, Claywell's response "was unclear. She would begin a sentence and then stop and look at [the officer] as if she had finished her sentence, but [the officer] wasn't sure what she was trying to tell [him]." (Tr. Vol. II, p. 54). This happened "at least three or four" times. (Tr. Vol. II, p. 54). Claywell's speech was "slow and disorganized." (Tr. Vol. II, p. 56). When Officer Meeks asked for identification, Claywell provided "some

sort of pamphlet of paperwork that was no[t] identification." (Tr. Vol. II, p. 85).

[7] At the officers' request to exit the vehicle, Claywell was "[v]ery unsteady coming out of the vehicle. Using both hands on both sides, one hand on the car door and one hand on the car frame. Very slow. When she was on her own two feet, [the officers] were concerned that she may fall down." (Tr. Vol. II, p. 86). At that time, Officer Meeks called for medical assistance. However, before the ambulance arrived, Officer Meeks administered a vertical gaze nystagmus test—which is one field sobriety test "designed to indicate the presence of a narcotic o[r] other drug." (Tr. Vol. II, p. 64). Officer Meeks and Officer Shelton both observed involuntary jerking of Claywell's eyes. Once emergency medical personnel arrived, the officers helped escort Claywell to the ambulance. The paramedic noted that Claywell had "a very high heart rate." (Tr. Vol. II, p. 62).

[8] The officers followed the ambulance to Eskenazi Hospital. Based on Claywell's "slow and disoriented speech and her unsteady balance, poor manual dexterity and the fact that she was operating a vehicle," Officer Meeks believed that he had probable cause that Claywell was operating a motor vehicle while intoxicated. (Tr. Vol. II, p. 68). Accordingly, he advised Claywell of Indiana's implied consent law, informing her that she was required to submit to a chemical test, the refusal of which would result in the suspension of her driving privileges. At first, Claywell indicated that she would consent, but when a nurse arrived to complete the test, Claywell declined. As a result, Officer

Meeks obtained a warrant to retrieve a sample of Claywell's blood. The lab results indicated a presence of phencyclidine in Claywell's blood. Phencyclidine—more commonly known as PCP—is "a central nervous system depressant as well as a stimulant and it also has hallucinogenic properties." (Tr. Vol. II, p. 113). PCP is known to "cause an increased heartrate as well as disorientation. A lot of confusion and stupor and it can also have people hallucinate and see things that aren't really there." (Tr. Vol. II, pp. 113-14).

[9] On June 28, 2016, the State filed an Information, charging Claywell with Count I, operating a vehicle while intoxicated in a manner that endangers a person, a Class A misdemeanor. On December 2, 2016, the State amended the Information by adding Count II, operating a vehicle while intoxicated with a controlled substance, a Class C misdemeanor. On February 10, 2017, the State filed to add a habitual vehicular substance offender sentencing enhancement to the Information. At Claywell's initial hearing on June 28, 2016, the trial court appointed an attorney from the Marion County Public Defender Agency to represent her.

[10] On June 29, 2016, the trial court ordered the immediate suspension of Claywell's driver's license for one year based on Claywell's refusal to submit to a chemical test when offered. On July 28, 2016, Claywell filed a verified petition for a hearing on her refusal to submit to a chemical test. Claywell claimed that she "did not refuse to take a chemical test and/or was not properly advised of the Indiana Implied Consent Law." (Appellant's Conf. App. Vol. II, p. 33). On August 16, 2016, Claywell, via her public defender, requested that

the refusal hearing scheduled for August 17, 2016, be converted to a pre-trial conference based on counsel's belief that "a refusal hearing is [not] in . . . Claywell's best interests." (Appellant's App. Vol. II, p. 38). The trial court granted Claywell's motion and converted the hearing to a pre-trial conference.

[11] On August 17, 2016, the trial court held the pre-trial conference as requested. At that time, Claywell voiced her displeasure over her attorney's actions in cancelling the refusal hearing and alleged that there had been an attempt to coerce her into accepting a plea bargain. Claywell's public defender explained that he was endeavoring to act in Claywell's best interests, but he had advised her that "[i]f you would like to represent yourself or hire an attorney, you may do that." (Supp. Tr. p. 7). Claywell then responded, "Right. So I came to represent myself. So I'm here for my Refusal hearing to represent myself." (Supp. Tr. p. 7). From there, the following colloquy ensued:

> THE COURT: Well, here's the procedural trick now is that first, we have to sort out the issue that you have an attorney, because you can't have both.
>
> [CLAYWELL]: I know. So, he can withdraw[] and I can file an appearance to move forward pro se.
>
> THE COURT: Are you moving with withdrawal?
>
> [PUBLIC DEFENDER]: I don't know that the Public Defender Agency can legally withdraw[]. She can file to represent herself Pro Se.
>
> THE COURT: Ok.

[PUBLIC DEFENDER]:  Since we've been to [c]ourt, I can't actually withdraw[].

THE COURT:  Alright.  So, there's not much I can accomplish for you today and I'm sorry for that.  I can't make a Refusal hearing happen for you today.  The best I can do for you is we'll set this for Pre-Trial.  If your intention is to represent yourself--

[CLAYWELL]:  --Ok, and I will INAUDIBLE.  I'm going to INAUDIBLE South Meridian.  So I'll represent myself.  I'm going to INAUDIBLE South Meridian.

(Supp. Tr. pp. 7-8).

[12] Following the pre-trial hearing, Claywell continued to be represented by the Public Defender Agency, although it appears that a new public defender was assigned.  On October 12, 2016, the trial court conducted a hearing on the issue of Claywell's refusal to submit to a chemical test pursuant to Indiana's implied consent law.  Claywell contended that she did not knowingly refuse to submit to a chemical test when requested because she was too incoherent at the time.  However, the trial court found that evidence of Claywell's moments of clarity while refusing to submit to a chemical test—such as her repeated demands for the officers' names and badge numbers to report what she perceived as mistreatment—established that she was more "difficult or agitated versus being totally confused and out of it in this situation."  (Tr. Vol. II, p. 18).  Accordingly, the trial court denied Claywell's request to terminate the license suspension.

[13] Near the end of the refusal hearing, Claywell's public defender informed the trial court that, despite an earlier conversation with Claywell about not testifying regarding the refusal, Claywell was adamant that she did want to speak. However, the trial court advised Claywell that she "might want to listen to [her attorney's advice] because he's looking out for your best interest whether you think so or not and he's, he did a fine job arguing the facts that you had." (Tr. Vol. II, p. 20). The following conversation then occurred:

[PUBLIC DEFENDER]: Just to make the record clear. On and off through the past couple of weeks, my client has communicated that she wants to represent herself and I've told her that she's free to do that. In [c]ourt earlier today, she said that she's ok with me moving forward. At this point, I have to let her address the [c]ourt. She's communicating now that she wants to represent herself.

THE COURT: Is that your desire?

[CLAYWELL]: That's been my desire since the last hearing.

THE COURT: Why is that?

[CLAYWELL]: I told them out there that I wanted to represent myself in the hallway before I went to [c]ourt and he said something else, because nothing that I've sat here and given to him has been presented in [c]ourt today.

THE COURT: Well, let me explain something to you, because I know you've got a lot of stuff that you want to tell me. I know you've been in our [c]ourt office several times and you like to talk loud enough where I can hear you and I don't listen to what you're saying, because I can only listen to what is in front of me in [c]ourt. Now, there is one specific reason you were to be here

today.  Can you tell me what that was?

[CLAYWELL]:  A refusal hearing.

THE COURT:  Can you explain to me why we having [*sic*] that and what your burden was today?

[CLAYWELL]:  First off, because I was supposed to have one--

THE COURT:  --You were not supposed to have one last time you were here.  Let me make that very clear to you.

[CLAYWELL]:  I have the minutes right here and you approved it.

THE COURT:  You were not to have one last time.  What I told you was this.  Is that the officer had to be subpoenaed to be here.

[CLAYWELL]:  You weren't here last time.

THE COURT:  I have my file.  Ok.  So I can already see right now that you representing yourself is probably not going to be in your best interest, but we're going to go through this.  You've had Pre-Trial Conferences.

[CLAYWELL]:  On the minutes it says, I mean, it was approved and then I got a phone call at home and was told if I didn't take a plea bargain that they were going to, I got called on a Monday night and told that if I did not take a plea bargain, that they were going to withdraw[] the refusal hearing.  I think that's like against my amendments.

THE COURT:  Wow.  You need a lawyer and you need one bad--

[CLAYWELL]:  --I'm not INAUDIBLE--

THE COURT: --Because, what you just said right there makes zero sense at all.

[CLAYWELL]: Zero sense to get a phone call and get--

THE COURT: --That doesn't make any sense--

[CLAYWELL]: --Threatened--

THE COURT: --And that you're going to have to take a plea or your refusal hearing is going away and that it's against your amendments. You are going to be held to the same standard as a practicing attorney. Alright.

[CLAYWELL]: That's fine. I'm going to go to 50 South Alabama. That's fine.

THE COURT: No. It doesn't just happen like that. You don't get to act disrespectful to the [c]ourt and then just walk out.

[CLAYWELL]: I'm sorry.

THE COURT: I'm just going to go to 50 South Alabama and do whatever you're going to do. I don't know what you're going to do there. I have no idea or Meridian, I have no idea what you're doing. Ok.

[PUBLIC DEFENDER]: INAUDIBLE I think there are some INAUDIBLE for [t]rial if she lets me represent her.

THE COURT: There might be. There very well could be issues, but if she's not going to listen to what they are, then that's on her. We set it for refusal hearing. You got your refusal hearing. This has been moving fairly, along fairly quickly. You've gotten everything, but you don't have your lab results is what the State has not yet provided and what they are going to have to provide that before [t]rial. . . .

(Tr. Vol. II, pp. 21-24). The trial court and attorneys then briefly discussed trial dates before circling back to Claywell's desire to proceed *pro se*.

> THE COURT: . . . As far as you wanting to represent yourself, how far did you go in school?
>
> [CLAYWELL]: I'm INAUDIBLE college. I've been a paralegal for fourteen years. I know the implied consent law. I've been working in criminal justice for longer than fourteen years.
>
> THE COURT: You've been a paralegal for a criminal attorney? Who's that?
>
> [CLAYWELL]: I've worked for Steven Gellar and for Marla Thomas officer [*sic*].
>
> THE COURT: Ok. Have you ever appeared in [c]ourt with either of them or sat through any [t]rials with any of those people?
>
> [CLAYWELL]: Some, I mean, I'm not concerned with that. I know what I need to do.
>
> THE COURT: I don't think you do. Maybe you should call one of those.
>
> [CLAYWELL]: I am. I have. So, I will.
>
> THE COURT: They're not going to take your case or what's the situation?
>
> [CLAYWELL]: I'll deal with that.
>
> THE COURT: No. I'm going to deal with this right now, because I'm not going to have you drag this on[] forever. [The public defender] has been--

[CLAYWELL]: --He's been awesome.

THE COURT: He has been and he also has a lot of other clients that he could devote a lot of time and effort to if you're going to hire someone, I'm going to let you get on with that. I'm going to set [t]rial dates and they're going to be ready and if they're not ready, that's on them.

(Tr. Vol. II, pp. 25-26).

On December 8, 2016, the parties convened for a pre-trial conference, during which the issue of self-representation was again raised.

> [PUBLIC DEFENDER]: Judge, just to cover my bases. At some point during representation, at points in representation, [Claywell] has indicated that she would rather represent herself. It keeps coming up. So, my, to cover my file.
>
> THE COURT: He's an attorney. Would you like to speak with him? Go [a]head. You can hire an attorney at any point in time. You're free to do that. [The public defender] has been working with you. [The public defender] is familiar with your case. He's the one that's setting depositions, that's doing research and investigating on your behalf. I will tell you this. If you want to hire someone and you bring them in a week before your [t]rial date, they better be up to speed after all the months of prep that this attorney has done on your behalf. I will not give a continuance. It will go and that's how it is. Got it?
>
> [CLAYWELL]: INAUDIBLE.
>
> THE COURT: Wow. I tell you. You have not learned much since day one when you have come in here about how to address the [c]ourt, how to talk in a professional manner to your attorney

who is working his ta[il] off on your behalf. You cannot see that? That concerns me greatly. I mean, that really concerns me. Your inability to recognize the amount of work that he has done so far for you and if you're inability [*sic*] to recognize that, you are really clouded in your judgment. His job is not to sit here and blow sunshine every day. His job is to represent you, make sure your rights are protective [*sic*] and to make sure that you understand [the] proceedings and you understand all of your options. You may not like some of the options, but if he doesn't tell you each option that is available to you, he's not doing his job and he's being ineffective. He's being very [e]ffective. He's going quite frankly, he's going, from what I'm hearing about some of these discovery issues that he is tackling, he's doing the things he's supposed to be doing. Now, the delay is no cause of his. The delay is because there was a witness that was unavailable. That is why there was a delay.

[CLAYWELL]: I'm not questioning the delay.

THE COURT: Ok, and I'm going to reset it and when we reset it, unless there's some sort of issue with a witness that might be unavailable or maybe you need more time to gather more information, I will gladly give it, but what I'm telling you is I'm not going to play games with lawyers coming in here. If you want to hire an attorney, you need to go hire a lawyer and you need to do it very quickly, because we are not bumping this out because you want to bring someone in here at the last minute. I want you to be aware of that. You need to have realistic expectations that this is how the process will move. So we're going to set it February 17th.

(Tr. Vol. II, pp. 31-33).

On February 17, 2017, the trial court conducted a bench trial, during which Claywell was represented by her public defender. Pursuant to an agreement

with Claywell, the State, at the beginning of the trial, moved to dismiss the habitual vehicular substance offender enhancement. At the close of the evidence, the trial court found Claywell guilty of both Counts of operating while intoxicated—one as a Class A misdemeanor and the other as a Class C misdemeanor. However, the trial court entered a judgment of conviction only as to Count I, the Class A misdemeanor—vacating Count II under double jeopardy principles. Proceeding directly to sentencing, the trial court imposed a sentence of one year, with ten days executed and the remainder suspended to probation. In addition, the trial court ordered Claywell to complete a substance evaluation and treatment as a condition of probation.

[16]   Claywell now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

### I. *Standard of Review*

[17]   Claywell claims that the trial court denied her Sixth Amendment right to self-representation. The Sixth Amendment to the United States Constitution stipulates that, in all criminal prosecutions, a defendant "shall enjoy the right . . . to have the Assistance of Counsel for his defen[s]e." U.S. CONST. amend. VI. The United States Supreme Court has held that, implicit in this Sixth Amendment right, is a corollary right of self-representation. *Faretta v. California*,

422 U.S. 806, 821 (1975).[1]  "A request to proceed pro se is a waiver of the right to counsel, and consequently, there are several requirements to invoking the right of self-representation successfully."  *Stroud v. State*, 809 N.E.2d 274, 279 (Ind. 2004).  Specifically, a defendant's "request must be clear and unequivocal, and it must be [made] within a reasonable time prior to the first day of trial."  *Id.* (alteration in original).

[18]  Once a defendant asserts a desire to proceed without the assistance of counsel, the trial court must ensure that any Sixth Amendment waiver is "'knowing, intelligent, and voluntary.'"  *Id.*  "Waiver of the right to assistance of counsel may be established based upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused."  *Taylor v. State*, 944 N.E.2d 84, 89 (Ind. Ct. App. 2011).  Factors to consider when determining whether a defendant has knowingly, intelligently, and voluntarily waived her right to counsel include:  "(1) the extent of the court's inquiry into the defendant's decision, (2) other evidence in the record that establishes whether the defendant understood the dangers and disadvantages of self-representation, (3) the background and experience of the defendant, and (4) the context of the defendant's decision to proceed pro se."  *Id.* at 90 (quoting *Poynter v. State*, 749 N.E.2d 1122, 1127-28 (Ind. 2001)).  A trial court "is in the best position to assess whether a defendant has knowingly

---

[1]  Article 1, Section 13 of the Indiana Constitution also guarantees a criminal defendant's right to self-representation; however, in the present case, Claywell has raised only a claim under the federal Constitution.

and intelligently waived counsel." *Id.* On appeal, this court "will most likely uphold the trial judge's decision to honor or deny the defendant's request to represent [herself] where the [trial court] has made the proper inquiries and conveyed the proper information, and reaches a reasoned conclusion about the defendant's understanding of his rights and voluntariness of his decision." *Id.*

## II. *Claywell's Pro Se Requests*

In this case, Claywell indicated that she desired to proceed *pro se* on three occasions: at the August 17, 2016 pre-trial hearing (which had previously been scheduled as a refusal hearing); at the October 12, 2016 refusal hearing; and at the December 8, 2016 pre-trial conference. In each instance, the trial court briefly discussed the issue with Claywell but never formally ruled on her requests. Claywell now requests that we reverse her conviction and remand for a new trial.

The State, however, claims that Claywell waived her right to self-representation because she failed to clearly, unequivocally, and timely request it. A request to proceed *pro se*

> must be "sufficiently clear that if it is granted, the defendant should not be able to turn about and urge that he was improperly denied counsel." If the rule were otherwise, trial courts would be in a position to be manipulated by defendants "clever enough to record an equivocal request to proceed without counsel in the expectation of a guaranteed error no matter which way the trial court rules."

*Dobbins v. State*, 721 N.E.2d 867, 871 (Ind. 1999) (internal citations omitted). As to timeliness, defendants must assert requests for self-representation "within a reasonable time prior to the first day of trial"—more specifically, "morning-of-trial requests are *per se* untimely." *Moore v. State*, 557 N.E.2d 665, 669 (Ind. 1990).

[21] Claywell points out that her first request was made eight months prior to trial; her second request was made four months before trial; and her final request was lodged eight weeks before trial. We agree with Claywell that her requests were made within a reasonable time prior to trial. *See Russell v. State*, 383 N.E.2d 309, 314 (Ind. 1978) (indicating that the *Faretta* Court found a request made "weeks before trial" to be timely and adding that "we do not think that the right must be asserted at that early a time to be realized"). Nevertheless, the State suggests that Claywell's first request, *i.e.*, on August 17, 2016, was untimely because it was made after the refusal hearing had been rescheduled to a pre-trial conference. Assuming *arguendo* that there is any merit to the State's assertion that Claywell's "request to represent herself at her refusal hearing did not also convey to the court that she wanted to represent herself at her trial," Claywell's third request, *i.e.*, on December 8, 2016, clearly related to her representation at trial and was made within a reasonable time beforehand. (State's Br. p. 13).

[22] The State also contends that Claywell's last two requests to proceed *pro se* were unclear and equivocal. Our courts have previously held that a defendant's general questions about the right to proceed *pro se*, "half-hearted expressions of dissatisfaction with counsel," and "offer[s]" to proceed *pro se* (*i.e.*, offering to

proceed *pro se* to obtain a speedy trial) fail to constitute "a clear assertion of a right." *Dobbins*, 721 N.E.2d at 872. In this case, however, Claywell explicitly and repeatedly stated that she wanted to represent herself. During the first instance, at the August 17, 2016 pre-trial conference, Claywell stated, "I came to represent myself" and asked that her public defender be permitted to withdraw. (Supp. Tr. p. 7). When the trial court and her public defender indicated that there were procedural hurdles to withdrawal, she stated that she was "going to [50] South Meridian" and she concluded, "I'll represent myself." (Supp. Tr. p. 8). On the next occasion, at the conclusion of the refusal hearing of October 12, 2016, Claywell stated to the trial court that it had "been my desire since the last hearing" to proceed *pro se*. (Tr. Vol. II, p. 22). The trial court questioned Claywell's motive and dissatisfaction with her attorney, but when Claywell's response lacked clarity and proper legalese, the trial court stated, "Wow. You need a lawyer and you need one bad." (Tr. Vol. II, p. 23). Nevertheless, Claywell's request was unequivocal enough for the trial court to briefly question whether Claywell understood the dangers of self-representation. Claywell described that she had worked as a paralegal and "kn[e]w what [she] need[ed] to do." (Tr. Vol. II, p. 26). Yet, instead of making a determination as to Claywell's ability to proceed *pro se*, the trial court pursued a discussion as to why Claywell had not asked one of her prior employers (criminal defense attorneys) to represent her and then simply proceeded with scheduling the next hearing without any further discussion of Claywell's waiver. Finally, two months before the trial on December 8, 2016, Claywell's public defender conveyed that Claywell had requested to proceed *pro se*. From there, the trial

court did not allow Claywell an opportunity to speak but rather chastised her (albeit in response to a perceived display of disrespect to the court) for failing to appreciate the work done by her public defender and discussed her hiring of private counsel.

[23] We find that Claywell's statements were sufficiently clear, unequivocal, and timely so as to trigger the trial court's duty "to hold a hearing to determine the defendant's competency to represent [herself] and to establish a record of [her] waiver of [her] right to counsel." *Dowell v. State*, 557 N.E.2d 1063, 1066 (Ind. Ct. App. 1990), *trans. denied*; *cert. denied*, 502 U.S. 861 (1991). Each time Claywell asserted her wish to proceed *pro se*, the trial court, instead of directly addressing the request, either challenged Claywell's reasoning and capacity to represent herself, scolded her for failing to appreciate the services of her public defender, advised her to retain private counsel, or changed the subject entirely.

[24] The State maintains that Claywell vacillated between proceeding *pro se* and utilizing her public defender, but the State relies on statements made *by* the public defender to the court about Claywell's inconsistent desire to represent herself—*i.e.*, the public defender informed the court that Claywell had discussed representing herself "[o]n and off through the past couple of weeks." (State's Br. p. 13; Tr. Vol. II, p. 21). Claywell herself never wavered when given the opportunity to speak.[2] The State also argues that Claywell acquiesced to her

---

[2] Contrary to the State's assertion, we do not find that Claywell's acknowledgement that her public defender had been "awesome" negated her desire, or her right, to present her own defense. (Tr. Vol. II, p. 26).

public defender's presence at trial. Our court has previously stated that a clear and unequivocal request "is made when a defendant objects to a court's order appointing counsel and does not acquiesce in the court-appointed counsel's presentation of the defense." *Jenkins v. State*, 809 N.E.2d 362, 367 (Ind. Ct. App. 2004), *trans. denied*. Here, Claywell expressly asserted her desire to proceed *pro se* at multiple hearings. However, her public defender specifically indicated that he could not withdraw until Claywell actually filed to appear *pro se*, and the trial court ignored Claywell's attempts for permission to do so. The record demonstrates that the various interjections by the trial court during each of the three hearings effectively stifled Claywell, but she should have received the opportunity to make a knowing, intelligent, and voluntary waiver of her right to counsel. *See Stroud*, 809 N.E.2d at 282 (despite ultimately finding that the defendant vacillated between representation and proceeding *pro se*, noting that a trial court should not "be dismissive of a defendant's requests to proceed without a lawyer. It would be much easier to evaluate these claims on appeal if trial courts would err on the side of being cautious and hold a hearing to determine whether a defendant is waiving the right to counsel, even if such a hearing may not strictly be required because a defendant's request is not clear and unequivocal"). Because the violation of a defendant's right to self-representation is not subject to harmless error analysis, "a new trial is warranted." *Osborne v. State*, 754 N.E.2d 916, 921 (Ind. 2001).

# CONCLUSION

Based on the foregoing, we conclude that Claywell was denied her Sixth Amendment right of self-representation and is entitled to a new trial.

Reversed and remanded.

Robb, J. and Pyle, J. concur